NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THERESA SEIBERT, on behalf of herself and all others similarly situated,<br><br>           *Plaintiff,*<br><br>           v.<br><br>QUEST DIAGNOSTICS INCORPORATED, QUEST DIAGNOSTICS INCORPORATED SEVEREANCE PAY PLAN, QUEST DIAGNOSTICS EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE, SURYA N. MOHAPATRA, JOHN NOSENZO, THOMAS SCHOENHERR, and JANE AND JOHN DOES 1 through 10,<br><br>           *Defendants.* | Civ. No. 11-304 (KSH)<br><br><br><br><u>OPINION</u> |

**Katharine S. Hayden, U.S.D.J.**

      Plaintiff, Theresa Seibert, brings this action against her former employer Quest Diagnostics Incorporated and various Quest entities (collectively "Quest") alleging age discrimination pursuant to the New Jersey Law Against Discrimination (NJLAD) and violations under ERISA. In addition, Seibert alleges that three individually named defendants aided and abetted each other in violating the NJLAD. Seibert seeks to bring this suit as a class action on behalf of similarly situated former Quest sales force employees who claim to have been terminated or forced to resign because of their age.

      In her amended complaint Seibert seeks to represent two classes of former Quest employees:

>**NJLAD Class:** All persons who (1) held sales positions in Quest's Physician, Hospital or MedPlus Sales Organizations during the period from November 18, 2008 to the present (the "Class Period"); (2) (i) were involuntarily terminated during the Class Period after being placed on a PIP, (ii) resigned during the Class Period after being placed on a PIP, or (iii) resigned during the Class period after being advised that they were going to be placed on a PIP; and (3) were forty (40) years of age or older at the time their employment with Quest came to an end.
>
>**ERISA Sub-class:** All persons who (1) held sales positions in Quest's Physician, Hospital or MedPlus Sales Organizations during Class Period; (2) (i) were involuntarily terminated during the Class Period after being placed on a PIP, (ii) resigned during the Class Period after being placed on a PIP, or (iii) resigned during the Class period after being advised that they were going to be placed on a PIP; and (3) were forty (40) years of age or older at the time their employment with Quest came to an end; and (4) were denied severance benefits under the severance plan.

(Amend. Compl. at ¶ 191.)

Now before the Court is Quest's motion on the NJLAD discrimination claims to "limit the class to New Jersey employees" and dismiss the claims against the individually named defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court will grant the motion.

## I. Factual Background and Procedural History

Quest is "the world's leading provider of diagnostic testing, information and services." (Amended Compl. ¶ 29.) Quest is a Delaware corporation, with its headquarters in Madison, New Jersey, and it conducts business through its offices and facilities throughout the United States. (*Id.*) Quest's sales force is split into groups that cater to different operating segments of Quest's business. The Physician Sales Organization comprises the majority of Quest's sales representatives and "focuses on the marketing of clinical laboratory testing, anatomic pathology and related services to physicians, including physician specialists." (*Id.* at ¶ 57.) The Hospital Sales Organization focuses on the clinical testing needs of hospitals, and the MedPlus Sales

Organization focuses on selling diagnostic products and instruments to hospitals, laboratories, blood banks and clinics. (*Id.*)

Seibert worked as an Account Sales Representative in the Physician Sales Organization for 21 years before she was terminated. She seeks to represent other members of the Quest sales force who were allegedly discriminated against because of their age. (*Id.* at ¶¶ 2, 4–5.)

Surya N. Mohapatra was the Chairman, President and CEO of Quest during the relevant time period. (*Id.* at ¶ 32.) He hired John Nosenzo in January of 2008 as the Vice President of Sales and Marketing for Quest's Physician Sales Organization. (*Id.* at ¶ 33.) Tom Schoenherr was hired as the Regional Vice President of Sales for Quest's Physician Sales Organization in September of 2008 and reported directly to Nosenzo. (*Id.* at ¶ 34.) All three worked out of the Madison, New Jersey headquarters during the relevant time period of November 18, 2008 to the present. (*Id.* at ¶¶ 32–33, 3.)

Back in 2006, Quest lost a contract with its largest client; the company's economic situation continued to worsen through 2008 during the broad downturn in the national economy. (*Id.* at ¶ 68.) Quest had initially believed it could improve its cost structure by reducing the size of the workforce and by voluntary attrition, but as of 2008 it was clear that these measures would not be enough. (*Id.* at ¶¶ 68, 76.) Mohapatra announced a nationwide plan to "reshape, remake and re-energize" the Quest sales force through changes in the "performance management and assessment processes." (*Id.* at ¶ 76.) Seibert alleges that Mohapatra hired Nosenzo and Schoenherr in 2008 to help him effectuate this plan, which aimed to "manage out" the older members of the Quest sales force and replace them with "younger, less experienced and lower-paid sales people." (Pl.'s Opp. Br. 5; Amended Compl. ¶ 83.)

Specifically, Seibert alleges that the defendants manipulated both financial information and the performance review system so that the "older members of the sales force suddenly appeared to be underperforming and were either terminated for 'poor performance' or resigned knowing they would be terminated regardless of their performance." (Pl.'s Opp. Br. 5.) She claims older employees were given unreasonably high sales quotas and when they could not meet them, they were placed on Performance Improvement Plans ("PIPs") with equally unattainable requirements for mandatory improvement. (Amended Compl. ¶¶ 88–108.) At the conclusion of the PIP period, employees who did not meet the requirements were fired or resigned knowing they were going to be fired, and lost the severance benefits they would have otherwise been qualified to receive. (*Id.* at ¶103.) As a result, "Quest's sales force now reportedly has an average tenure of less than 18 months." (*Id.* at ¶ 25.)

Seibert filed suit in New Jersey state court claiming that Quest violated the NJLAD by engaging in unlawful discrimination, and the individual defendants violated the NJLAD by aiding and abetting each other and Quest in discriminatory conduct. Defendants removed the case to this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). Seibert was permitted to file an amended complaint in which she added two additional claims—that Quest violated ERISA by preventing employees from obtaining severance benefits, and that the Quest Severance Plan and Employee Benefits Committee violated ERISA by denying employees severance benefits they were otherwise entitled to. Thus, the amended complaint proposed two classes—a nationwide NJLAD class and a nationwide ERISA sub-class. (*See id.* at ¶ 191.)

Pursuant to directions from Magistrate Judge Shwartz, defendants filed this motion to limit the NJLAD class to New Jersey employees and to dismiss the NJLAD claims against the individually named defendants. Upon reviewing the parties' submissions, the Court ordered

Seibert to show cause why she should not be required to amend her complaint to reflect an NJLAD class that consists only of former Quest employees that were employed in New Jersey.

## II. Analysis

### A. *Application of the NJLAD to putative class members employed outside New Jersey*

Seibert seeks to represent a nationwide class of former Quest sales force employees who, being 40 years of age or older, were involuntarily terminated or forced to resign in violation of the NJLAD. (Amended Compl. ¶ 191(a).) Implicitly, the NJLAD class would include former employees who worked for Quest outside New Jersey. Defendants contend that the NJLAD only applies to employees who worked in New Jersey.

Seibert argues that legislative history and legislative intent demonstrate that the NJLAD should broadly apply in this context. She cites to *American Jurisprudence* for the proposition that "unless the intention to have the statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history," it is presumed *not* to apply extraterritorially. (Pl.'s Opp. Br. 17); 17 *Am Jur. 2d Statutes* § 250 (2011). She argues the New Jersey legislature "evinced such intent" because although it modeled the NJLAD after New York's discrimination statute, it did not verbatim adopt the New York language, which limited the application of its statute to "the people of this state." (Pl.'s Opp. Br. 17–18.) New Jersey's statute instead affords protections to the "inhabitants of this state." It is disingenuous to argue that the use of the word "inhabitants" as opposed to "people" somehow demonstrates the legislatures "clearly expressed" intent to give the NJLAD a broad extraterritorial application. *See Norenius v. Multaler, Inc.,* 2008 N.J. Super. Unpub. LEXIS 2923, at *18–19 (App. Div. Sept. 11, 2008) ("We do not perceive that the protections afforded to 'inhabitants' under the LAD were intended to extend to 'inhabitants' of other states employed exclusively within the

borders of those states."). Significantly, "although the statutory language of NJLAD does not explicitly require the protected employment to occur in New Jersey, New Jersey courts 'have consistently . . . only applied the NJLAD if the plaintiff worked in New Jersey.'" *Turkus v. Util. Mfg. Co., Inc.,* 2007 U.S. Dist. LEXIS 25056, at *4–5 (D.N.J. Apr. 2, 2007) (Thompson, J.) (quoting *Satz*, 2003 U.S. Dist. LEXIS 27237 at *46).

Alternatively, Seibert argues that the issue of whether the NJLAD applies cannot be decided on the present record because it requires a complex analysis under New Jersey's choice of law rules and more facts are necessary to undertake the inquiry properly. (Pl.'s Opp. Br. 24–26.) She notes that New Jersey applies the "most significant relationship" test to resolve choice of law issues and argues that this test emphasizes where the wrongful conduct took place, which she claims is New Jersey. Seibert points to "numerous" contacts out-of-state former Quest employees had with New Jersey: (1) Quest is headquartered in Madison, New Jersey; (2) the discriminatory policies emanated from top management in New Jersey; (3) the 3 individually named plaintiffs all worked out of offices in New Jersey; (4) high-ranking employees were required to sign non-compete agreements that included a choice of law provision dictating New Jersey law governed the agreements; and (5) Quest did not contest that New Jersey is the proper venue for this action. (Amended Compl. ¶¶ 40–46.) Based on these "numerous connections," Seibert argues the NJLAD should apply to all class members, or at the very least the choice of law issue should be addressed later on a more developed record.

Albeit the New Jersey Supreme Court adopted the "most significant relationship" test in 2008, that ruling applied to tort actions. *P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 136 (N.J. 2008) ("Although we have traditionally denominated our conflicts approach as a flexible 'governmental interest' analysis, we have continuously resorted to the *Restatement (Second) of*

*Conflict of Laws* (1971) in resolving conflict disputes arising out of tort. That approach is the 'most significant relationship' test."). The governmental interest test still appears to be used in the employment context. And under this test, for New Jersey "substantive law to be [applied] in a constitutionally permissible manner, [New Jersey] must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Blakey v. Continental Airlines, Inc.,* 164 N.J. 38, 65 (2000) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981)).

Using the governmental interest analysis, "New Jersey courts have consistently applied the law of the state of employment to workplace claims, and have therefore only applied the NJLAD if the plaintiff worked in New Jersey." *Satz v. Taipina*, No. 01-cv-5921, 2003 U.S. Dist. LEXIS 27237, at *45–46 (D.N.J. Apr. 15, 2003) (Simandle, J.), *aff'd*, 122 F. App'x 598 (3d Cir. 2005). *See also Buccilli v. Timby, Brown & Timby*, 283 N.J. Super. 6, 10–11 (App. Div. 1995) (finding that when a New Jersey resident worked exclusively in Pennsylvania, Pennsylvania law (the law of the state of her workplace) applied and the NJLAD (the law of the state of her residence) did not); *Brunner v. AlliedSignal, Inc.,* 198 F.R.D. 612, 613–14 (D.N.J. 2001) (Orlofsky, J.) (finding that when a New Jersey resident worked exclusively in the Pennsylvania office of an employer headquartered in New Jersey, Pennsylvania law applied and the NJLAD did not); *Weinberg v. Interep. Corp.,* No. 05-5458, 2006 U.S. Dist. LEXIS 23746, at *19 (D.N.J. Apr. 26, 2006) (Simandle, J.) (finding that "Plaintiff's New Jersey residency is irrelevant to the issue of whether he can assert a discrimination claim under the NJLAD" because "Plaintiff's claims relate to an allegedly wrongful termination that occurred in New York based on his employment in Pennsylvania."); *Albert v. DRS Techs., Inc.,* 2011 U.S. Dist. LEXIS 55320, at *5 (D.N.J. May 23, 2011) (Martini, J.) (finding that NJLAD did not apply when plaintiff worked in

Florida even though she claimed she worked for a New Jersey corporation and the decision to terminate her came from the New Jersey office); *Diana v. AEX Group*, No. 11-1838, 2011 U.S. Dist. LEXIS 100928, at *7–8 (D.N.J. Sept. 7, 2011) (Sheridan, J.) (finding plaintiff failed to state a claim for relief under the NJLAD where plaintiff resided in New Jersey but worked in Pennsylvania for a Pennsylvania corporation). "The law of the state of the employee's workplace applies to claims arising from his employment because the state has an 'unusually strong interest in applying its own law to employment contracts involving work in [its] state.'" *Id.* at 45 (quoting *Shamley v. I.T.T. Corp.,* 869 F.2d 167, 172 (2d Cir.1989)). "This restriction on the extraterritorial application of the NJLAD is rooted in the well-settled understanding that New Jersey law regulates conduct in New Jersey, not outside the state." *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657–658 (D.N.J.2008) (Simandle, J.) (internal quotation and citation omitted).

  Seibert attempts to counter these unambiguous holdings by arguing that "where the conduct took place is of particular importance" in the choice of law analysis and the alleged discriminatory conduct here emanated from Quest's New Jersey headquarters. (Pl.'s Opp. Br. 25.) *See also Swick v. UPS*, 2005 U.S. Dist. LEXIS 15630, at *28 n.7 (D.N.J. July 25, 2005) (Greenaway, J.) (considering where the plaintiff worked, where the business unit she worked for was located, and where the termination decision was made). However, "[a]lthough the location where an employment decision takes place (e.g., at a corporate headquarters) may be relevant, it is certainly not dispositive." *Schneider v. Sumitomo Corp. of Am.,* 2010 U.S. Dist. LEXIS 59101 at *9 (D.N.J. June 14, 2010) (Cavanaugh, J.) (citing *Satz,* 2003 U.S. Dist. LEXIS 27237, at *50). Judges in the state and federal courts of New Jersey have continuously found that "the most critical factor is the location where the employee works." *Id.* at *7. Seibert's argument also

ignores the fact that the ramifications of headquarters' alleged decision to engage in discriminatory conduct were felt outside New Jersey in the states in which Quest sales force employees worked. The alleged discriminatory "conduct" that affected the employment status of a given Quest Sales force employee—whether it be termination or a poor performance evaluation that resulted in a resignation—took place in the state where that employee was employed, not just in New Jersey.

This distinction was examined in *Schneider*, where defendants argued that New York law should apply to plaintiff's discrimination claims because defendant was a New York based corporation, the decision to terminate the plaintiff was made in the New York office, and any reinstatement of plaintiff would have occurred in New York. 2010 U.S. Dist. LEXIS 59101 at *8–10. But the court found that plaintiff's place of employment was New Jersey, and the NJLAD applied to her claims because she had worked for defendant for 16 years exclusively out of a New Jersey office and was receiving disability benefits from New Jersey during an absence from work. *Id.* at *10–11. In concluding that the NJLAD applied, the court relied on those connections that demonstrated New Jersey was where plaintiff *worked* as opposed to where the employer was headquartered.

Seibert has failed to cite any case in which a court has held that the NJLAD applies to the employment discrimination claims of a plaintiff with a place of employment outside New Jersey. Seibert instead argues that there is no "bright line rule" requiring employment in New Jersey and the strength of the connection between Quest headquarters in New Jersey and potential class members elsewhere in the United States is so strong that it is factually distinguishable from all the prior cases that considered the issue. (Pl.'s Opp. Br. 21–24.) Her argument is unavailing. Although none of the above-cited cases arose in the context of a class action, the opinions are

explicit that the NJLAD does not apply to the discrimination claims of (1) New Jersey residents who work outside of the state, *Buccilli,* 283 N.J. Super. 6; (2) New Jersey residents who work outside the state for employers with headquarters in New Jersey, *Brunner*, 198 F.R.D. at 613–14; and (3) non-residents of New Jersey who work outside of the state for companies headquartered in New Jersey and named individual defendants who lived and worked in New Jersey, *Satz*, 2003 U.S. Dist. LEXIS 27237, at *43–52. Thus, the claimed connections between purported class members employed outside of New Jersey and the state are insufficient to support the extraterritorial application of the NJLAD.

Finally, Seibert suggests that *D'Agostino v. Johnson & Johnson, Inc.*, is instructive and demonstrates how this Court should evaluate the choice of law question and apply New Jersey law. *D'Agostino*, however, arises in a different context—the New Jersey *Pierce* public policy doctrine and the federal Foreign Corrupt Practices Act (FCPA)—and the New Jersey Supreme Court's conclusion that the choice of New Jersey law was appropriate in that case is simply inapplicable here. In *D'Agostino*, the plaintiff was a resident of Switzerland, employed by a Swiss subsidiary of Johnson & Johnson. *See* 133 N.J. 516 (1993). He was terminated by the subsidiary at Johnson & Johnson's direction after refusing to participate in an allegedly illegal bribing of Swiss pharmaceutical licensing authorities in violation of the FCPA and Johnson & Johnson's own Policy Statement on the use of corporate funds for unlawful purposes. *Id.*

After engaging in an in-depth governmental interest choice of law analysis, the New Jersey Supreme court concluded that New Jersey had a greater interest in applying its law than Switzerland, even though the plaintiff lived and worked there. *Id.* at 544–45. The court explained:

> We hold that because the underlying controversy 1) involves an alleged violation in New Jersey of the Foreign Corrupt Practices Act, 15 U.S.C.A. §§ 78dd-1 to -2

> (hereinafter FCPA), which sets forth a domestic policy against bribery of a foreign regulatory official; 2) involves the participation of a United States citizen who might have been exposed to criminal prosecution had the conduct violated the FCPA and was an alleged violation of a New Jersey corporation's internal policy against such overseas commercial bribery; and 3) because violation of the governmental policies could have an indirect effect on the domestic market for pharmaceutical products and the health and welfare of this forum's citizens, New Jersey's interests in resolving this dispute under its laws outweigh the Swiss interest in the at-will employment relationship that would not seek to deter such conduct through its civil law.

*Id.* at 519.

This reasoning is not instructive in the case at bar. First, the court noted that *D'Agostino* was a "very close" case because Switzerland had an obvious interest in maintaining Swiss employment relationships. The court nonetheless believed that the domestic policy interest in negating foreign corrupt practices of a New Jersey corporation had qualitatively greater weight: "we are not exporting New Jersey employment law so much as applying New Jersey domestic policy, drawn from federal sources, to a domestic company." *Id.* at 539. The court's decision was also supported by the conclusion that the FCPA by its very nature was intended to have an extraterritorial effect—regulating the conduct of American citizens abroad—and by adopting the FCPA policy against corrupt practices as its own policy, New Jersey's public policy had an intended and permissible extraterritorial effect. *Id.* at 533–34, 540. The Court did note, however, that "[i]n many (if not most) instances the forum policies are not intended to have an extraterritorial effect." *Id.* at 540.

Moreover, the simple fact that *D'Agostino* does not involve the NJLAD or its extraterritorial effect should not be overlooked. New Jersey courts have been clear in expressing how the NJLAD applies. In *Buccilli*, decided after *D'Agostino*, the New Jersey Appellate Division concluded that "the damage claim of a New Jersey resident for her allegedly wrongful dismissal from out-of-state employment is governed by the law of the state in which she was

11

employed." 283 N.J. Super. at 10–11.  Since that ruling, both federal and state courts in New Jersey have consistently applied the NJLAD to the claims of persons employed in New Jersey only.  As the Third Circuit has held, "[w]e do not disregard a decision of an intermediate appellate state court on an issue of controlling state law unless we are 'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Chemical Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 227 (3d Cir.1999) (citation omitted).  *D'Agostino*, a case which was decided prior to *Buccilli* and relates to a choice of law issue implicating a foreign nation and statutes other than the NJLAD, does not serve as persuasive authority for Seibert's position.

The language of Seibert's complaint demonstrates her intent to certify a class of former Quest employees who worked for Quest outside the state of New Jersey; in fact, it contains an entire section devoted to the experiences of "older members of the sales force *throughout the country*." (Amended Compl. ¶¶ 137–190 (emphasis added).)   It discusses the experiences of specific non-New Jersey employees: Cindy Martell who worked in the Syracuse, New York office for 26 years (*Id.* at ¶¶ 138–39); Tena Barry who worked in the St. Louis, Missouri office for 20 years (*Id.* at ¶¶ 152–53); Julie Bernhard who worked in the Seattle, Washington office for 24 years (*Id.* at 158.); Bruce Taylor who worked in the Denver, Colorado office for "many years" (*Id.* at ¶¶ 165, 165);  Cheryl Adair who worked in the Cincinnati, Ohio office for 30 years (*Id.* at ¶ 166); Patricia Jamison who worked in a northern Colorado office (*Id.* at ¶¶169–70); and Carrie Weihler who "lived on the border of Illinois and Iowa and was part of the Chicago, Illinois unit" for 19 years (*Id.* at ¶ 175).  One must assume that an employee who worked in Ohio for 30 years, or in Washington for 24 years, would be more likely to look to the law of that state to protect him or her, and not the law of a foreign state in which he or she was never employed.

The complaint alleges that "Quest has been repeatedly sued around the country for its discriminatory course of conduct" and lists former Quest sales force employees (who would be included in the purported NJLAD class) who filed complaints with both the Equal Employment Opportunity Commission and state regulatory bodies. (Compl. ¶¶ 20–24.) That a former employee from Colorado lodged a complaint with the Colorado Civil Rights Division and a former employee from Missouri lodged a complaint with the Missouri Commission on Human Rights demonstrates that these non-New Jersey former Quest employees used the law of their state of employment to vindicate their rights. A blanket of New Jersey employment law thrown over such claims is not what the NJLAD is meant for.

Rather, it is well settled that the "NJLAD protects . . . both residents and non-residents working in New Jersey [,but] [e]mployees working outside New Jersey . . . are not protected even if they are New Jersey residents." 18 Marvin M. Goldstein & Stanley L. Goodman, *New Jersey Practice* § 4.2 (2d ed. 2011). The Court concludes on the well-settled authority cited above that Seibert has failed to show cause why she should not be required to amend her complaint to allege a purported NJLAD class that includes only former Quest employees that were employed in New Jersey.

### B. *NJLAD claims against individually named defendants for aiding and abetting*

The second count of Seibert's amended complaint alleges that the three individually named defendants—Surya Mohapatra, John Nosenzo, and Tom Schoenherr—also engaged in discriminatory conduct in violation of the NJLAD. Defendants argue the claims fail as a matter of law and must be dismissed. Pursuant to Fed. R. Civ. P. 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them

13

in the light most favorable to Seibert, the Court finds she fails to state a claim upon which relief can be granted.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

The NJLAD prohibits unlawful discrimination by an "employer," but the New Jersey Supreme Court has found that the definition of "employer" as used in the NJLAD does not include individual employees.  *Tarr v. Ciasulli*, 181 N.J. 70, 83 (2004).  However, an individual employee may be liable under the NJLAD as an aider or abettor if the plaintiff establishes that: "(1) the party whom the defendant aids . . . perform[s] a wrongful act that causes an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant . . . knowingly and substantially assist[ed] the principal violation."  *Id.* at 84 (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999)).

It is well settled that a "principal wrongdoer, cannot aid and abet his own wrongful conduct."  *Newsome v. Admin. Office of the Courts*, 103 F. Supp. 2d 807, 823 (D.N.J. 2000)).  Thus, employees in supervisory roles cannot be held liable for their own discriminatory employment decisions but, rather, may be liable when they substantially assist in the discriminatory conduct of another employee.  *See e.g., Putterman v. Weight Watchers Int'l, Inc.*, No. 10-1687, 2010 U.S. Dist. LEXIS 85754, at *3–4 (D.N.J. Aug. 19, 2006) (Chesler, J.) (Noting that "central to the establishment of aiding and abetting liability in this type of case is the element of having provided substantial assistance to the principal violator.  In the instant Complaint, because [the supervisor] herself is the principal violator, Plaintiff cannot show that she provided substantial assistance to herself."); *Tsakonas v. Nextel Commc'n, Inc.*, No. 04-1363, 2006 U.S. Dist. LEXIS 62072 at * 17–18 (D.N.J. Aug. 31, 2006) (Sheridan, J.) (dismissing the individually named defendants in an employment discrimination action because the "individuals

were the decision makers, [and] it is difficult to categorize them other than the 'principal wrongdoers.'"). To determine whether a supervisor "substantially assisted" the principal wrongdoer, courts routinely analyze five factors from the *Restatement (Second) of Torts*: "(1) the nature of the act encouraged; (2) the amount of assistance given by the supervisor; (3) whether the supervisor was present at the time of the asserted harassment [or discrimination]; (4) the supervisor's relations to the others; and (5) the state of mind of the supervisor." *Tarr*, 181 N.J. at 84.

Defendants argue that the claims against Mohapatra, Nosenzo, and Schoenherr fail as a matter of law because each is painted as a principal wrongdoer in the complaint, and thus they cannot be liable for aiding and abetting their own wrongful conduct. (Defs.' Reply Br. 12–15.) Specially, defendants cite to part of the complaint which states that the individual defendants "conceived and directed a discriminatory nationwide plan to 'manage out' the older members of the Company's sales force." (Amended Compl. ¶ 11.) Seibert for her part argues that the individual defendants were not named as principal wrongdoers but that they aided and abetted *each other* in unlawful conduct in violation of the NJLAD. (Pl.'s Opp. Br. 27.)

Accepting the factual allegations in the complaint as true, Seibert cannot escape the fact that she paints each of the named defendants at one time or another as the principal wrongdoer. The complaint contains both allegations of specific wrongful acts on the part of each individual *and* allegations that the defendants aided one another in engaging in discriminatory conduct. The pleadings do not indicate that the named defendants were aiding or abetting wrongful conduct otherwise perpetrated by Quest or other Quest employees. None of these individual supervisor-defendants is accused of standing by while persons in their employ engaged in unlawful, discriminatory conduct. *See e.g.*, *Hurley*, 174 F.3d at 126–28; *Ivan v. Cnty. of*

15

*Middlesex*, 595 F. Supp. 2d 425, 462–64 (D.N.J. 2009) (Walls, J.). Quite the opposite; the crux of Seibert's claim is that Mohapatra, Nosenzo, and Schoenherr, working together, created and effectuated "a discriminatory nationwide plan to 'manage out' the older members of the Company's sales force." (Amend. Compl. ¶ 83.)

"It is not the act of discrimination but rather the failure in the employer's response that an aider and abettor is charged with assisting." *Ivan*, 595 F. Supp. 2d at 463. Here, Mohapatra, Nosenzo, and Schoenherr are alleged to have perpetrated the discriminatory conduct at issue. They are principal wrongdoers and they "cannot aid and abet [their] own conduct." *Newsome*, 103 F. Supp. 2d at 823. The motion to dismiss the second count of the amended complaint, naming individual defendants as aiders and abettors in violation of the NJLAD, is granted.

### III. Conclusion

For the forgoing reasons, Seibert is required to amend her complaint to allege a purported NJLAD class that includes only former Quest employees that were employed in New Jersey, and defendants' motion to dismiss the NJLAD claim against the individually named defendants is granted. An appropriate order will be entered.

March 28, 2012                                                                 /s/ Katharine S. Hayden
                                                                               Katharine S. Hayden, U.S.D.J.