NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| THERESA SEIBERT, on behalf of herself and all others similarly situated, | |
| Plaintiff, | |
| v. | Civ. No. 11-304 (KSH) |
| QUEST DIAGNOSTICS INCORPORATED, QUEST DIAGNOSTICS INCORPORATED SEVERANCE PAY PLAN, QUEST DIAGNOSTICS EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE, SURYA N. MOHAPATRA, JOHN NOSENZO, THOMAS SCHOENHERR, and JANE AND JOHN DOES 1 through 10, | **OPINION** |
| Defendants. | |

**Katharine S. Hayden, U.S.D.J.**

I.  **Introduction**

Theresa Seibert has sued Quest Diagnostics Incorporated ("Quest")[1] on civil rights and ERISA grounds.  She was terminated after working at Quest for over 25 years and claims that her termination was unlawful because it was based on her age—52 at the time—in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*; and because Quest purposefully and unjustifiably terminated her for poor performance in order to deny her

---

[1] The claims against individual defendants Surya N. Mohapatra, John Nosenzo, and Thomas Schoenherr have been dismissed.  [*See* D.E. 67.]  In this opinion, the term "Quest" includes the company as well as defendants Quest Diagnostics Severance Pay Plan and Quest Diagnostics Employee Benefits Administration Committee.

severance benefits in violation of §§ 502 and 510 of the Employee Retirement Income Security Act ("ERISA").   Quest has moved for summary judgment on all of Seibert's claims.  [D.E. 93.] Seibert has moved for partial summary judgment on the ERISA § 502 claim.  [D.E. 94.]

## II.  <u>Procedural Background</u>

Seibert initially sued in state court, seeking to represent a nationwide class of plaintiffs who allegedly had been discriminated against on the basis of their age, in violation of NJLAD. [D.E. 1.]  Defendants removed the action, invoking federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  On August 15, 2011, Seibert amended her complaint to add claims under §§ 502 and 510 of ERISA, on behalf of herself and another putative class comprised of a specified group of former Quest sales representatives over the age of 40 who had been placed on, or had been threatened to be placed on, a performance improvement plan and ultimately were fired or left the company and denied severance.  [D.E. 20.]

Defendants successfully moved to limit the NJLAD class to former Quest employees who had worked in New Jersey, as well as to dismiss the claims against the individual defendants. [D.E. 21, 66.]  As a consequence, Seibert filed a letter indicating that she would not seek to represent a putative NJLAD class.  [D.E. 68.]  Thus, as she stated in the letter, "the nature of the complaint . . . changed to a single-plaintiff complaint under the New Jersey LAD" and a putative ERISA class.  At that juncture, Magistrate Judge Shwartz ordered the parties to make summary judgment motions before Seibert files a motion to certify the ERISA class.  [D.E. 88.]  They did so, and the Court held oral argument.

## III.  <u>Facts</u>

This section of the Court's opinion is derived from various sources, including the facts to which the parties stipulated in the Joint Pretrial Order [D.E. 105], the parties' respective

statements of undisputed material facts, and the numerous exhibits that were attached to the declarations submitted by counsel for plaintiff, Glen Savits, and to the certifications submitted by counsel for Quest, Gregory Parliman.  Those exhibits consist of deposition excerpts, declarations, and emails and other documents produced in discovery.  Unless otherwise noted, there are no disputes concerning the following background facts.

Quest, which is headquartered in Madison, New Jersey, is a leading provider of diagnostic testing, information, and services.  For about 26 years, Seibert was a salesperson for Quest and its predecessor companies.  When she was terminated, she held the position of Account Sales Representative in the Teterboro Business Unit of Quest's Physician Sales Organization.  Her duties included maintaining and generating new sales of products and services to physician and medical practice accounts within her territory.

Seibert, like other Account Sales Representatives, underwent annual performance evaluations, which were partially based on sales statistics.  With respect to sales, Seibert was judged based on her percentages of both "total attainment," which referred to business retention, and "new sales" or "upsell," which referred to a quota for bringing in new business.

Evaluations culminated in an overall performance rating.  From 2004 through 2008, Seibert received the rating "Achieves Expectations," even though from 2005 through 2008 she failed to meet her total sales attainment and from 2006 through 2008 she failed to satisfy her new sales quota.  Gerard Giordano, Seibert's District Sales Manager, who had provided Seibert with her evaluations for those years, testified that he had been generally satisfied with her performance.  (Declaration of Glen D. Savits in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Savits Opp. Decl."), Ex. E, Giordano Dep. 17:1–4.)

In those evaluations, Giordano commented (as stipulated in the Joint Pretrial Order) about the unique challenges that Seibert faced, including the "questionable" business practices of competitors in her territory, "the politics of the local hospital," a "tough territory climate" with "unique market dynamics," and that her territory was facing "tumultuous market conditions" and had "little opportunity to grow."  In the years leading up to her termination, several clients in Seibert's territory discontinued doing business with Quest.  According to Giordano's deposition testimony, the majority of these losses were probably not within Seibert's control.  (Giordano Dep. 139:8–140:1.)

In addition to territory-specific problems, Quest as a whole lost some financial footing in 2007 when United HealthCare, a major client, cancelled its contract—a loss that Quest expected would reduce revenue by somewhere between seven and ten percent.  Quest embarked on an initiative to reduce its cost structure.  Its Chief Financial Officer, Robert Hagemann, said during a 2007 investor earnings call, "[A]s we look at the $500 million in savings that we expect to get over the next several years, certainly a significant piece of that is going to come from reduced people costs[.]"[2]

In January 2008, Quest hired John Nosenzo as its Vice President of Sales and Marketing in the Physician Sales Organization.  From emails and other documents submitted with the parties' briefs, it appears that Nosenzo played a lead role in overseeing staff reductions.  In September 2008, Nosenzo wrote Quest's CEO Surya Mohapatra in an email that he had committed to reducing staff by "101 heads" by the end of the year, and explained how.  (Savits Opp. Decl., Ex. PPP.)  From the email:

---

[2] Defendants excerpt Hagemann's statement verbatim from the transcript of the call, in paragraph 73 of their answer to the amended complaint.  [D.E. 78.]

- I . . . charged my RSVPs to find the territories to close and consolidate.

- Not wanting to do this by [a reduction in force] I drove the consolidation of some open positions first.  Then I approached the reduction by not filling some positions as they became open (either forced or unforced turnover).
   . . .
- Good news is we did this reduction without any "drama" in the field or rumors of firings or hiring freezes.  No small task!

(*Id.*)

Also under Nosenzo's direction, Quest altered its performance evaluation program to increase performance standards and individual accountability levels.  From the record, it appears that the centerpiece of the revamped evaluation process was a semi-annual meeting at which a District Sales Manager would present ratings for the Account Sales Representative being reviewed.  Session Qs, as the meetings were called, were attended by the District Sales Manager giving the evaluation, a group of other District Sales Managers, Sales Directors, and occasionally more senior management.  Session Qs focused in large part on the employee's "scorecard"—a document comprising quantitative and qualitative performance assessments.  Seibert had her first Session Q in 2009, and her rating dropped from the "Achieves Expectations" rating she had been given over the previous five years, to "Unsatisfactory."  Her scorecard reflected that she had met only 72% of her total sales attainment and 26% of her new sales quota.

In August 2009, Seibert was placed on a Performance Improvement Plan ("PIP") that identified four areas of improvement, including increasing her sales.  Although he had created the PIP, Giordano said at his deposition that it "was probably unlikely" that Seibert would have

been able to meet the set quota.  (Giordano Tr. 114:4–19.)  And in December 2009, although she had improved in three of the areas, her sales performance got weaker.[3]

Seibert's exhibits show that while she was on the PIP, Giordano began suggesting to Quest's Human Resources department that her territory be eliminated and her accounts consolidated with neighboring ones.  In an email, he described this as "an attempt to equalize the opportunities among all the territories."  (Savits Opp. Decl., Ex. HHH.)  In response to his consolidation suggestion, Robert Kane, who worked in Quest's Human Resources, emailed Giordano that he should consider "if the facts/metrics of her performance warrant . . . advanc[ing] her to a final warning stage. . . . [I]t gives us another month of performance data on which to base a termination decision ( if it comes to that)."  (*Id.*)  Giordano sent a reply email, noting that he did not "think a 1 month final warning would cut it, given her current territory."  (*Id.*)  He also wrote, "please remember that I do not plan on a replacement.  Aren't these 2 different events[?]"  (*Id.*)

On December 16, 2009, Giordano issued Seibert a final written warning.  She was unable to boost her sales and, based on the data then available, finished 2009 ranked last among a group of 356 Account Sales Representatives.  After giving Seibert the final warning, Giordano sent an email on January 24, 2010, to his manager, Scott Orzolek, and Kane regarding the consolidation plan that he had previously recommended:

> Due to the steady decline in her territory, I think the next appropriate step would be to consolidate [plaintiff's] territory and separate her from the company.
>
> I've planned a realigning of some territories to accommodate this consolidation.  I would transfer the majority of the accounts to Laura Marie Tyburczy and a few to

---

[3] The three areas in which she improved, however, were, according to an email authored by a Human Resources executive, "designed . . . to drive the [sales] metrics."  (Savits Opp. Decl., Ex. Y.)

> Sharon Witter as they border [plaintiff's] existing territory. . . .  With these moves along with some movement of the low volume accounts . . . I would close [Seibert's territory].

(Savits Opp. Decl., Ex. EEE.)  Kane replied to Giordano, "[T]o have crystal clarity on this, at this point we are looking at a performance based involuntary separation without severance versus a reduction in force resulting from a business consolidation."  Orzolek responded, "Agree with Bob."  (*Id.*)

Four days later, on January 28, 2010, Quest terminated Seibert.  Quest did not hire a new employee to assume Seibert's responsibilities.  Rather, her accounts were divided between two existing sales representatives, both older than she was.  On January 31, 2010, three days after she was fired, Giordano sent out an email that Seibert's territory would be consolidated and that she would not be replaced.  (Savits Opp. Decl., Ex. AAA.)

Under the terms of the Quest Diagnostics Incorporated Restated Severance Pay Plan (the "Plan"), which is attached as Exhibit K to the Certification of Gregory Parliman in Support of Quest's Motion for Summary Judgment ("Parliman Cert."), an employee terminated due to "a reduction-in-force, job elimination, facility closing, reorganization or consolidation" was eligible to receive severance payments, whereas one terminated for "reasonable cause, including . . . poor performance" was not.  On February 3, 2010, Seibert received a letter that gave information about post-termination benefits, including COBRA and 401(k), but said nothing about severance payments.  On February 11, 2010, through her attorney, Seibert made a claim for severance benefits to Ruth McCormick in Human Resources.  The letter claimed that Quest had violated ERISA and stated that "it is clear that Quest deliberately manipulated the circumstances of Ms. Seibert's termination so as to deny her severance under the Company's severance plan." (Parliman Cert., Ex. H.)

Seibert's claim was referred to Quest's legal department which responded via email on April 13, 2010, stating in part, "Ms. Seibert was terminated for legitimate business reasons related to her failure to meet Quest Diagnostics' performance expectations for her position. Given this fact, she was properly determined to have been ineligible for severance." (Parliman Cert., Ex. M.)

Employees whose claims are denied are not without recourse. The Plan states that an employee may seek review from an Appeals Committee within 60 days of receiving the adverse response. The Summary Plan Description states that an employee "will receive a written response to [the] claim, and a description of the final appeal process." (Parliman Cert., Ex. G.) Seibert's denial notification did not include any information regarding an appeal, and she never did appeal.

The parties' stipulated facts in the Joint Pretrial Order reflect that Nosenzo left the company in May 2010, and documents submitted with their motions indicate that aspects of the performance-review system were reevaluated after his departure.

### IV. <u>Standard of Review</u>

The Court can grant summary judgment "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Transamerica Occidental Life Ins. Co. v. Total Sys. Inc.*, 11-1960, 2013 WL 518586, at *2 (3d Cir. Feb. 13, 2013) (citing Fed. R. Civ. P. 56(a)). "A genuine dispute about any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (citation omitted). The nonmoving party must come forward with some evidence— but "more than merely 'a scintilla'"—to support its position. *Id.* (citations omitted). At this

stage, the Court must make all justifiable inferences in the nonmovant's favor.  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

**V.  <u>Analysis</u>**

    1.  <u>Quest's Motion for Summary Judgment on the § 510 Claim</u>

    ERISA § 510 states that it is unlawful for an employer to interfere "with the attainment of any right to which [a] participant may become entitled under the plan." 29 U.S.C. § 1140.  It thus "prohibits employers from discharging or harassing their employees in order to keep them from obtaining [employee] benefits."  *DiFederico v. Rolm Co.*, 201 F.3d 200, 204 (3d Cir. 2000) (citations and internal quotation marks omitted).  To succeed on such a claim, a plaintiff must show that the employer had the specific intent to violate ERISA, although she need not show that such intent was "the *sole* reason" for the complained-of actions.  *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987) (citation and internal quotation marks omitted).  Rather, a plaintiff must show only that "the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits."  *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 523 (3d Cir. 1997); *see also Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007).

    Where there is no "smoking gun" direct evidence of unlawful interference, a plaintiff may rely on circumstantial evidence, and the Court uses a burden-shifting framework similar to the one articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Jakimas*, 485 F.3d at 785.  Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case, and if successful, the employer has the burden of articulating a legitimate, nondiscriminatory reason for taking the action at issue.  *Id.* at 785–86.  "If the

employer satisfies its burden, then the plaintiffs must prove by a preponderance of the evidence that the reason articulated by the defendant is merely pretextual." *Id.* at 786.

To establish a *prima facie* § 510 violation, a plaintiff must show that "(1) the employer committed prohibited conduct (2) that was taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Id.* at 785 (citation and internal quotation marks omitted). If the production burden returns to the plaintiff to show pretext, that showing can be satisfied either by evidence that demonstrates the employer was motivated by a discriminatory purpose, or evidence that discredits the employer's justification. *Id.* at 786. "The pretext analysis focuses the court's attention on whether the defendant's proffered reason was the real reason for its decision." *Id.* Here, Quest argues that Seibert cannot establish a *prima facie* case because she "has simply no evidence to prove that interference with her eligibility for severance benefits . . . was a motivating factor in the decision to terminate her employment," and that even if she could make out a *prima facie* case, she is unable to show that Quest's performance-based justification was pretextual. (Defs.' MSJ 32.) The Court disagrees.

The Third Circuit's decision in *Eichorn v. AT & T Corp.*, 248 F.3d 131 (3d Cir. 2001) is instructive and guides the Court's decision. The plaintiffs and putative class representatives in *Eichorn* were former employees of an AT&T affiliate, Paradyne. *Eichorn*, 248 F.3d at 137. AT&T had engaged in certain corporate transactions that resulted in the following situation: Paradyne was sold to another company, and the Paradyne employees were to become employees of the purchasing company, at least temporarily, in order to ensure a successful transition. *Id.* at 136–37. Pursuant to an agreement made in connection with the sale, no AT&T affiliate could rehire the Paradyne employees for at least eight months after the deal's consummation. *Id.* at 137.

10

Under AT&T's pension policy, employees had "bridging rights," which permitted them to retain their accrued pension benefits if they departed from the company but were rehired within six months.  *Id.*  As a result of the eight-month no-hire agreement, therefore, the Paradyne employees' accrued pension benefits were completely lost, and the plaintiffs alleged AT&T's conduct violated ERISA § 510.  *Id.*  The district court entered summary judgment in favor of AT&T, reasoning that the plaintiffs had failed to produce *prima facie* evidence of AT&T's specific intent to interfere with their pension benefits.  *Id.*

Third Circuit reversed that decision, holding that the plaintiffs had presented sufficient circumstantial evidence to survive summary judgment.  *Id.* at 150 ("[W]e believe at this stage of the proceedings plaintiffs have presented sufficient circumstantial evidence of intent to interfere with their pension rights to create a genuine issue of material fact.").  The court summarized the evidence that it found to be persuasive as follows:

> In support of their claim, plaintiffs argue the eight month restriction on re-employment is suspiciously close to the six month vesting period of the AT&T pension plan and that this temporal proximity provides circumstantial evidence that the cancellation of the benefits was a motivating factor in the timing of the no-hire agreement. . . .  Plaintiffs also cite a confidential memorandum . . . which acknowledges the eight month restriction in the no-hire agreement had the practical effect of cancelling the Paradyne employees' pension rights. Finally, plaintiffs point to the economic benefits that both Lucent and AT&T received from the no-hire agreement, specifically that neither defendant was required to pay for pension benefits, as evidence of specific intent to interfere with an ERISA pension plan in violation of § 510.

*Id.* at 149.

This record, like the one in *Eichorn*, offers circumstantial evidence supporting Seibert's § 510 claim.  Seibert's evidence shows that management in general and Nosenzo in particular were concerned about Quest's financial condition, from which a factfinder could reasonably infer that, at the time she was terminated for cause, the company was motivated to reduce or

11

eliminate severance costs.  For example, after Quest lost revenue sources in and around 2007, its Chief Financial Officer said on an earnings call that "a significant piece" of its planned cost reductions was going to come "from reduced people costs."  There are various references in the record to Quest's intention to cut staffing by ten percent.  Pursuant to the company's severance plan, however, a reduction of "people costs" through a RIF would have made many of the terminated employees eligible for severance.  Seibert points to the deposition testimony of a former Human Resources director, Joyce Herlihy, who said that Quest did not use a RIF "[b]ecause there were other ways that would be better for the business," and that terminating an employee for poor performance is less expensive than doing so through a RIF.  (Savits Opp. Decl., Ex. F., Herlihy Dep. 74:8–75:6.)  Seibert's evidence includes an email among employees in the Human Resources and finance departments concerning a sales reorganization plan (apparently unrelated to Seibert's territory) that had gone awry; about unexpected severance payments that could result,  one participant wrote, "We need to know right away what the potential RIF dollars are. . . .  Corporate watches extremely closely the severance dollars we approve and if it turns out that this has over 100K exposure we are in a bit of a bind."  (Savits Opp. Decl., Ex. OO.)

To avoid using a RIF to reduce "the budgeted headcount," John Nosenzo wrote Quest's CEO that he planned to "consolidate some open positions" and then "not fill[] some positions as they became open (either forced or unforced turnover)," and touted the fact that he was able to do this "without any drama in the field or rumors of firings."  (Savits Opp. Decl., Ex. PPP.)  A factfinder could find that Nosenzo's evaluation system consciously provided management with a tool to push some employees into "voluntarily" leaving the company.  The evaluation revamp also could operate as cover for a reduction in the number of employees that would otherwise

trigger benefits like severance.  And in her submissions, Seibert provides the sworn declaration of Joseph Abbamont, her brother and putative class member, who was a District Sales Manager at Quest and had worked there for 30 years. Abbamont states that Nosenzo's evaluation system "ignored the realities of the marketplace to value only the achievement of sales quotas, even though those numbers became unrealistic to reach." (Abbamont Decl. ¶ 8.)  He characterizes Session Qs as "marathon sessions" designed "to create as much pressure on the manager as possible to give as many representatives as possible who did not meet their attainment numbers, for whatever reason, an unsatisfactory rating." (*Id.* ¶ 9.)  Once given an unsatisfactory rating, the employee would be placed on a PIP, which Abbamont called

> a figurative death sentence to the representative, used to create an appearance of fairness. . . .  On numerous occasions Mr. Nosenzo made it clear to the managers that the PIP process was meant to drive out the sales people who did not reach their attainment numbers and have those people "self-select" their departure. . . . No effort was made to make the required improvement achievable when someone was put on a PIP.

(*Id.* ¶ 12.)  Seibert also points to an email from Jack Kenny, then a Quest Vice President of Marketing, who wrote, "I am attaching the Performance Management Process I put in place [at a former employer] that helped us 'raise the bar' and drive out poor performers. . . .  Just FYI as I see us with similar 'wiring.'"  (Savits Opp. Decl., Ex. ZZ.)  The email's attached presentation encouraged "Aggressive Performance Management" and included an instruction to "[d]rive out . . . 'C Players.'"  (*Id.*)

From the record it appears the aggressive performance management got the attention of higher-level management.  David Norgard, a Vice President of Human Resources, testified at his deposition that Quest's CEO had articulated to him that they were "not exactly doing the right thing with some of the sales force."  (Savits Opp. Decl., Ex. J, Norgard Dep. 141:14–142:7.)

13

And when asked if he had ever expressed the view that the implementation of the Session Qs had been "pitiful and destructive," Norgard testified that, "It would certainly have been something similar to that." (*Id.* 144:14–22.)

The Court is satisfied that the foregoing evidence can support a reasonable inference that Quest was motivated to interfere with Seibert's eligibility for severance benefits and unjustifiably terminated her to avoid paying them, establishing a *prima facie* case. As to meeting the burden of showing pretext, Seibert has adduced evidence that her performance up until 2009 had been adequate enough to receive the "Achieves Expectations" rating despite regularly missing her quotas, and that the quotas set for her in 2009 and in her PIP were unachievable. Her supervisor Giordano testified that she could "[p]robably not" have met her total sales attainment goal in 2009, that the loss of many accounts in her territory "were probably uncontrollable" and that "[i]t was probably unlikely" that Seibert could have met the sales quota he had established in her PIP (Giordano Dep. 100:16–101:1, 114:4–19, 139:8–140:1.) Furthermore, an internal Quest document that ranked Account Sales Representatives using a "revised" 2009 budget—apparently created in February 2010, after Seibert's termination— indicated that under the new budget she had achieved 99.8% of her sales quota in 2009 and was ranked 69 out of over 354—not last. (Savits Opp. Decl., Ex. QQQ.)[4]

Additionally, near the time of her termination, there were discussions among Giordano, upper-level management, and Human Resources about Seibert's eligibility for severance, supporting her claim that "the reason for [her] termination was open to interpretation and manipulation." (Pl.'s Opp. 28.) Giordano received emails from Robert Kane in Human

---

[4] Quest disputes that the revised budget ranking demonstrates that Seibert performed well; it contends that the revised budget was adjusted to reflect "all of the business that was lost on plaintiff's watch." (Defs.' Reply 6–7 n.4.)

Resources in December 2009 and January 2010 in response to his suggestion to consolidate Seibert's territory, in which he was told

- To "consider if the facts/metrics of her performance warrant is to advance her to a final warning stage. . . . it gives us another month of performance data on which to base a termination decision ( if it comes to that)." (Savits Opp. Decl., Ex. HHH.)

- Even if working in a territory that was going to be consolidated, "[i]f an employee is managed out of the company due to performance issues, this is not a severance eligible event.  It would [be] an involuntary termination and not covered under our severance policy."  (*Id.* Ex. X.)

- "[T]o have crystal clarity on this, at this point we are looking at a performance based involuntary separation without severance versus a reduction in force resulting from a business consolidation." (*Id.* Ex. EEE.)

In *Eichorn*, the Third Circuit found sufficient circumstantial evidence in the form of questionable timing of the challenged conduct, the defendants' probative statements, and their economic motivation.  Seibert has adduced a similar quantum of evidence that is sufficient to survive summary judgment.  Quest's motion on the § 510 claim is denied.[5]

---

[5] In a footnote of its reply brief, Quest argues that an independent basis for the Court to dismiss the § 510 claim is that monetary damages are unavailable to Seibert.  (Defs.' Reply 13 n.9.)  It cites *Eichorn v. AT&T. Corp.*, 484 F.3d 644 (3d Cir. 2007) ("*Eichorn II*"), the second time the Third Circuit dealt with the case and where the court held that only equitable remedies are available to a plaintiff who alleges a § 510 violation.  In that particular case, the court held that summary judgment in favor of the defendants was warranted because plaintiffs sought "pension benefits for work they never did . . . . [which is] akin to 'back pay,' [and] which is not an equitable remedy within the meaning of the statute."  *Eichorn II*, 484 F.3d at 656.  The court also noted that in a "prototypical" § 510 case where plaintiffs allege that their employer wrongfully terminated them to prevent their pension rights from vesting, "the typical remedy is reinstatement."  *Id.* at 658.  The court said, however, that "[t]his is not to say that an ERISA plaintiff's demand for money necessarily requires the conclusion that the relief sought is not 'equitable' within the meaning of the statute."  *Id.* at 655 n.6.  The Court does not consider the argument persuasive or timely raised.

15

2.   Quest's Motion for Summary Judgment on Seibert's NJLAD Claim

Seibert has also alleged that Quest terminated her employment on the basis of her age in violation of NJLAD.  Quest contends that the Court must enter summary judgment in its favor because the allegation is unsupported by the record and fails as a matter of law.

Similar to § 510 claims, courts use the *McDonnell Douglas* burden-shifting framework to assess NJLAD claims.  *See Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009) ("An NJLAD plaintiff may prove discrimination or retaliation according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*[.]")  Thus, Seibert's initial burden is to establish a *prima facie* case.  *Id.* The Third Circuit, looking to New Jersey law, has said that this burden requires the plaintiff to show that she: "(1) was a member of the protected class , *i.e.,* was over 40,  (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination."  *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004).   It is undisputed that Seibert has met her burden with respect to elements one and three, but Quest contends that Seibert cannot establish elements two and four.

On the second element, Quest argues that Seibert must demonstrate that she was performing at a level that met Quest's legitimate expectations and that she cannot do so because she repeatedly failed to meet her sales quotas.  (Defs.' MSJ 16; Defs.' Reply 4–5.)  Quest's argument is flawed.

In *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 441 (2005), the New Jersey Supreme Court said that "the quality of the employee's performance does not come into play on the plaintiff's *prima facie* case."  Particularly relevant here, and damaging to Quest's contention, the court also said "[b]ecause performance markers like poor evaluations are more properly debated in the

16

second and third stages of the burden-shifting test, they do not come into play as part of the second prong of the *prima facie* case." *Zive*, 182 N.J. at 455.

And although the second element is at times described as meeting an employer's "legitimate expectations," a plaintiff can satisfy this minimal burden by producing evidence "showing that she was actually performing the job prior to the termination.'" *Id.* at 454. Evidence sufficient to make this showing includes "records documenting the plaintiff's longevity in the position at issue or from testimony from the plaintiff or others that she had, in fact, been working within the title from which she was terminated." *Zive*, 182 N.J. at 455. Longevity alone has been held enough to establish the second prong. For example, in *Hayes v. Furniture Brands Int'l, Inc.*, 351 F. App'x 599, 600 (3d Cir. 2009), the Third Circuit disagreed with the district court's holding that the plaintiff had failed to establish a *prima facie* case, noting that "a reasonable fact finder could also conclude that [plaintiff] was qualified for his job based solely on his 36 years of continued employment." Here, it is undisputed that Seibert worked for Quest in a sales position for over 25 years and that her performance evaluations and Giordano's testimony reflect that she was performing adequately. Based on this evidence, Seibert has shown that she was qualified for and performing in her position, thus, satisfying the second element.

As to the fourth, which zeroes in on what facts establish an inference of disparate treatment based on age, the parties dispute what Seibert must show to satisfy her burden. Seibert relies on certain Appellate Division cases, *Reynolds v. Palnut Co.*, 330 N.J. Super. 162 (App. Div. 2000) and *Williams v. Pemberton Township Public Schools*, 323 N.J. Super. 490 (App. Div. 1999), as well as *Zive*—which concerned discrimination on the basis of disability—for her position that all she must show to meet the fourth element is that "Quest had others perform the same work after she left." (Pl.'s Opp. 17.) Quest contends that Seibert must show that she was

replaced by a "sufficiently younger" person, which, it argues, she cannot do because she was not replaced and because the Account Sales Representatives who assumed her accounts were older than her.  (Defs.' MSJ 15–18.)

In *Monaco v. American General Assurance Co.*, the Third Circuit addressed a plaintiff's fourth element burden by examining the New Jersey Supreme Court's decision in *Bergen Commercial Bank v. Sisler*, 157 N.J. 188 (1999).  *Sisler* involved a claim of reverse-age discrimination (discrimination on the basis of youth), in which the court stated, "[U]nder the LAD . . . courts have modified the fourth element to require a showing that the plaintiff was replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'" 157 N.J. at 213 (citations omitted).  Based on *Sisler*, the *Monaco* court stated,

> [W]e are bound by the opinions of the state's highest court . . . .  To us it is clear from *Sisler* that when the Supreme Court of New Jersey set out the fourth element of the *McDonnell Douglas* prima facie case framework in an age discrimination case it regarded that standard as applicable in both traditional and reverse age discrimination cases, the difference being that in a traditional case the replacement employee must be sufficiently younger than the replaced employee[.]

*Monaco*, 359 F.3d at 303.  The *Monaco* court also concluded that in the context of a RIF, where an employee is not replaced, an NJLAD plaintiff must show that a sufficiently younger, similarly situated employee was retained.  *Id.* at 305; *see also Arenas v. L'Oreal USA Prods., Inc.*, 461 F. App'x 131, 134 (3d Cir. 2012).  Moreover, the *Monaco* court questioned how the *Petrusky* and *Reynolds* courts, which Seibert cites in support of her argument, could have interpreted *Sisler* as limiting the sufficiently younger requirement to only reverse discrimination cases.  *Monaco*, 359 F.3d at 303–04.  More recently, the Third Circuit made explicitly clear that "the *Sisler* refinement applies in all age discrimination cases under the NJLAD." *Arenas*, 461 F. App'x at 134.

18

Here, however, Seibert was neither technically replaced—the record indicates that her territory was eliminated after her termination—nor fired in connection with a RIF.  Rather, according to Quest she was fired for poor performance, and two Account Sales Representatives, both of whom were older, assumed her accounts.  Aside from presenting a scenario that does not fit neatly into the traditional termination-and-replacement or RIF contexts, Seibert's NJLAD claim is interwoven with her ERISA claim.  The ERISA claim is based on the theory that Quest sought a leaner group of Account Sales Representatives; her evidence on the NJLAD claim is that Quest wanted the group to be "meaner" as well, *i.e.*, younger.

"[S]tate anti-discrimination laws, as social remedial legislation, are deserving of a liberal construction."  *Sisler,* 157 N.J. at 216.  And to ensure that this remedial legislation fully serves its purpose, courts have eschewed robotic application.  *See, e.g.,  Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 107 (1990) ("[W]e have not hesitated to depart from the *McDonnell Douglas* methodology if a rigid application of its standards is inappropriate under the circumstances."); *Winkel v. Spencer Gifts, L.L.C.*, A-1343-08T1, 2010 WL 6090, at *5 (N.J. Super. Ct. App. Div. Jan. 4, 2010) ("[T]he precise elements of a *prima facie* case must be tailored to the particular circumstances.").

The Court is satisfied that Seibert has established the fourth element by adducing proofs that raise the inference that she was terminated on the basis of her age, not on her allegedly deficient performance.  The Court has already held that Seibert presents enough evidence that Quest wanted to create a leaner sales force without incurring large severance expenses, and that Seibert has adduced evidence from which it could reasonably be found that the company used questionable evaluations and overly aggressive performance management to achieve that goal. Seibert also has evidence that simultaneous to the cost-cutting measures, Quest was actively

19

seeking to reduce the age of its sales force—a goal that appears to have actualized.  Considered together, there is sufficient evidence for a jury to conclude that Seibert was discriminated against on the basis of her age and that Quest's justification was pretextual.

Seibert has presented the following evidence in support of this.  In November 2009, two months before she was fired, a Quest PowerPoint presentation titled "People Strategic Plan 2010–2012" was prepared or presented.  (Savits Opp. Decl., Ex YY.)  It contains a slide with the heading "Developing our own leaders and targeted recruitment helping to decrease average age in 3 key job families."  One of these job families was the sales group, which, according to the document, had an average age of almost 50.  (*Id.*)  In his declaration, Joseph Abbamont, a former District Sales Manager, says that he heard Thomas Schoenherr, a Regional Vice President of Sales, say that "Quest should be hiring these 'young and talented people from Pharma.'" (Abbamont Decl. ¶ 14.)  He also claims to have heard Nosenzo, Schoenherr, and recruiters say things such as, "[T]he people from Pharma were younger and more educated and therefore would be a big advantage over the representatives they replace."  (*Id.*)  According to Abbamont, "[i]t became clear . . . that Quest had developed a policy to drive out the representatives from Quest . . . in order to replace them with what they felt to be a more vibrant, younger, better educated class of sales people."  (*Id.*)  Abbamont's statements do not stand alone; Quest's CEO, Surya Mohapatra, said during a 2010 earnings call, "We're also hiring some young people who are coming from other industries.  The key is that we need to have a very engaging sales organization[.]"  (Savits Opp. Decl., Ex. AA, p. 19.)

The documents and testimony that Seibert has highlighted suggest that this plan was at least partially effectuated.  For example, the sales organization's turnover rate increased dramatically under Nosenzo—to a degree that raised concern among senior-level management.

Mohapatra testified that he "was concerned about turnover" (Savits Opp. Decl., Ex. I, Mohapatra Dep. 31:21–32:13) and David Norgard, a Human Resources VP, noted that the "sales force turnover was spiking up" (Norgard Dep. 144:6). From the record it appears that some who left the organization were older: in August 2009, at about the time Seibert was placed on a PIP, Robert Kane in Human Resources sent an email noting that "there are 11 reps that have been identified for going onto a PIP. Many of those are long term reps and in some cases former award winners." (Savits Opp. Decl., Ex. U.) There is evidence that the turnover had an effect on the average age of the sales force. An August 2010 email that was sent to Mohapatra noted that turnover rates were as high as 50% in some sales business units; it went on, "[W]e have a very young/inexperienced Sales force in many places and while the number of open positions is going down, there is still a learning curve to go through. In addition, the new Sales Reps will need to establish 'relationships' with our customers and this takes some time.'" (Savits Opp. Decl., Ex. OOO.)

Quest's emphasis on hiring younger sales representatives was ongoing at the time Seibert was terminated, which was also a time of severe staffing reductions. The questions raised from the record about the justification for firing her apply in the NJLAD context as well as her § 502 ERISA claim. In particular, the interrelationship of motivations behind both theories is such that the record as a whole provides sufficient evidence to permit Seibert's NJLAD claim to survive, and Quest's motion for summary judgment is denied.

3.   <u>Cross Motions for Summary Judgment on the ERISA § 502 Claim</u>

Seibert moves for partial summary judgment on the claim she brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which "allows a participant to bring a claim to recover benefits due to him under the terms of the plan." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845

21

(3d Cir. 2011). She claims that she should be awarded severance benefits—which, according to the summary plan description, is two weeks per year of service—because "not only was the denial of Plaintiff's claim arbitrary and capricious, but it also would have been arbitrary and capricious if she had appealed." (Pl.'s Reply 11–12.) As to the latter point, Seibert contends that the Court should issue a declaratory judgment to the effect that, as a matter of law, the Plan's "appeal process is in violation of ERISA's requirement with respect to the provision of a full and fair review." (Pl.'s MSJ 23.) Quest urges that the Court grant summary judgment in its favor on the § 502 claim because, among other reasons, Seibert did not appeal, and so she has failed to exhaust her administrative remedies. Quest also points out that by failing to appeal, Seibert lacks standing to seek a declaratory judgment. (Defs.' Opp. 18, 27.)

"Except in limited circumstances . . . a federal court will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990). Those limited circumstances exist when an appeal would be futile and where the plaintiff lacked meaningful access to the plan's administrative procedures. *See Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249–50 (3d Cir. 2002); *Majka v. Prudential Ins. Co. of Am.*, 171 F. Supp. 2d 410, 414 (D.N.J. 2001) (Irenas, J.). It is the plaintiff's burden to make a "clear and positive showing" that an exception is applicable. *Harrow*, 279 F.3d at 249. Seibert does not contend that either exception applies and has not made the requisite showing. She argues that she is excused from exhausting the Plan's procedures because the denial email did not give her "notice of her appeal rights and the appeal process." [6] (Pl.'s MSJ 18.) This is unpersuasive.

---

[6] While Seibert does not specifically contend that she lacked meaningful access to administrative procedures, this argument resembles such a claim. But "a denial of meaningful

22

ERISA § 503 and its accompanying regulations mandate that an employer include in a denial notification a "description of any additional material or information necessary for the claimant to perfect the claim . . . [and a] description of the plan's review procedures." 29 C.F.R. § 2560.503–1(g)(1).  Quest admits that it failed to comply with this provision.  The appropriate remedy, however, is not to excuse Seibert from seeking available administrative remedies, but rather to remand the case to the plan administrator and relieve plaintiff of the otherwise applicable time requirements:

> Where a termination letter does not comply with the statutory and regulatory requirements, the time limits for bringing an administrative appeal are not enforced against the claimant.  Thus, the remedy for a violation of § 503 is to remand to the plan administrator so the claimant gets the benefit of a full and fair review.

*Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir. 2000) (citations omitted).[7]

---

access occurs when 'one party has the sole power to invoke the higher levels of the review procedure and has not allowed another party access [and] . . . the other party [has] made attempts to have the higher levels of review initiated.'" *Majka*, 171 F. Supp. 2d at 415 (citation omitted). Seibert has presented no evidence that she made the required attempts.  And cutting against any argument that she lacked access is the fact that she admits information about the appeals process was in Quest's Employee Handbook (Pl.'s Reply 8 & n.3) and testified at her deposition that in 2009, after a meeting with Human Resources, she printed a copy from Quest's intranet and read it.  (Parliman Cert., Ex. A, Seibert Dep. 156:22–157:20.)  Moreover, her claim letter quotes from the Plan itself, indicating that she and her counsel had access to and read it.  (*See, e.g., id.*, Ex. H, p. 2.)  Access to the plan notwithstanding, the letter indicates Seibert's inclination to forgo the administrative process.  For example, even though the Plan gives Quest 90 days to respond to a claim before it is deemed "denied," Seibert's counsel warned that unless he heard from the company within ten days, he would assume that the company "does not want to resolve [the] matter amicably."  (*Id.* p. 3.)

[7] Seibert separately argues that Quest failed to state with specificity the reasons for denying her claim, which is also a statutory and regulatory requirement.  (Pl.'s MSJ 18.)  Assuming that the letter was deficient in this regard, such an inadequacy is irrelevant to the exhaustion requirement, and "remand is appropriate where the plan administrator has failed to make adequate findings or adequately explain the grounds of its decision."  *Grimes v. Prudential Fin., Inc.,* 09-419 (FLW), 2010 WL 2667424, at *16 (D.N.J. June 29, 2010) (Wolfson, J.)).

For the same reason—her failure to appeal—the Court agrees with Quest that it must reject Seibert's request for a declaratory judgment because she cannot be said to have suffered injury as a result of the appeals process.  As such, she lacks standing to ask for this relief.  "To bring a civil action under ERISA, a plaintiff must have constitutional, prudential, and statutory standing."  *Leuthner v. Blue Cross & Blue Shield of Ne. Pa*, 454 F.3d 120, 125 (3d Cir. 2006).  "To have standing to sue under Article III, 'a plaintiff must satisfy three constitutional preconditions: (1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision.'"  *Pa. Family Inst., Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007) (citation omitted).  Principles of constitutional standing do not lose their force when the requested relief is a declaratory judgment.  "A declaratory judgment may issue only where the constitutional standing requirements of a justiciable controversy are satisfied."  *Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 274 (3d Cir. 2006).   Finally, in the class-action context, a class representative cannot rely upon the injuries of putative class members to satisfy justiciability requirements where she herself lacks standing.  *Hassine v. Jeffes*, 846 F.2d 169, 176 (3d Cir. 1988).  "[T]he proper disposition of a case in which the putative class plaintiff lacks standing is to dismiss the complaint . . . and to avoid reaching a decision on the merits of the claims presented."  *Id.*

As a practical matter, if Seibert prevails on her NJLAD and ERISA § 510 claims, she arguably will not need an administrative forum to seek relief.  If she is unsuccessful, she will have the option to bring an out-of-time appeal administratively.  On her claims under § 502, then, Quest's motion is granted and Seibert's is denied, without prejudice to her invoking the administrative appeals process and seeking further judicial review if warranted.

**VI.**   <u>**Conclusion**</u>

  For the foregoing reasons, Quest's motion for summary judgment on the ERISA § 510 and NJLAD claims are denied, and its motion for summary judgment on the ERISA § 502 claim is granted.   Seibert's cross motion for partial summary judgment is denied.


  March 28, 2013           <u>/s/ Katharine S. Hayden      </u>
                     Katharine S. Hayden, U.S.D.J.