**NOT FOR PUBLICATION**

**United States District Court
for the District of New Jersey**

| | |
|---|---|
| THERESA SEIBERT, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>QUEST DIAGNOSTICS INCORPORATED, QUEST DIAGNOSTICS INCORPORATED SEVEREANCE PAY PLAN, QUEST DIAGNOSTICS EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE, and JANE AND JOHN DOES 1 through 10,<br><br>    Defendants. | Civil. No.: 11-0304 (KSH)<br><br><br><br>    **<u>Opinion</u>** |

**<u>Katharine S. Hayden, U.S.D.J.</u>**

   Before the Court is plaintiff Theresa Seibert's Fed. R. Civ. P. 23 motion for class certification.  [D.E. 124.]  She proposes to certify a class of certain former employees of defendant Quest Diagnostics Incorporated to bring a claim under § 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140.  For the reasons that follow, the Court concludes that several of the Fed. R. Civ. P. 23 factors weigh against certifying the proposed class and denies the motion.

# I. **Background**

## A) Procedural History

In early 2010, after 26 years with Quest, Theresa Seibert was terminated.  The reasons given were performance-based.  She filed suit in state court, alleging age discrimination and charging the defendants (Quest and several of its officers) with systemic violations of the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. § 10:5-1 *et seq.*  (*See* Compl. ¶ 1 [D.E. 1].)  She contended that as part of Quest's goal to restructure and resize its sales force, the company "caus[ed] older experienced people . . . to leave the employ . . . either by firing them or, to use Quest's terminology, by 'managing them out.'"  (Compl. ¶ 2.)

After Quest's removal of the action to federal court, Seibert amended her complaint to add two ERISA claims based on non-payment of severance to her and other fired employees. Count three of the amended complaint alleged a violation of ERISA's "anti-interference" provision (ERISA § 510, 29 U.S.C. § 1140), which forbids certain retaliatory actions against a participant or beneficiary in connection with the exercise or attainment of rights covered by ERISA.  Count four was an ERISA benefits-recovery/rights enforcement claim (ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)) against Quest itself, the Severance Plan, and the Employee Benefits Committee.  (Am. Compl. ¶¶ 208–17 [D.E. 20].)

Under the Quest Severance Plan (the "Plan," reproduced in the record at D.E. 93-2 and elsewhere), an employee who was terminated for certain reasons, such as a reduction in force ("RIF"), facility closing, or consolidation, would be entitled to a severance package that included two weeks of pay for each year of employment with Quest, up to a maximum of 52 weeks. Employees terminated for "reasonable cause"—a phrase encompassing performance-based

firings—were not eligible for benefits.  Seibert alleged that Quest fired her and others for sham

or manufactured "performance" reasons in order to avoid having to pay these severance benefits.

Counts one and two of the amended complaint, meanwhile, continued to charge the

defendants with age discrimination under the NJLAD.  (*See* Am. Compl. ¶¶ 195–207.)  Thus,

Seibert was now proposing two classes: an NJLAD class and an ERISA subclass.  (*See* Am.

Compl. ¶ 191.)

Quest moved to dismiss the complaint in part, arguing that a) the proposed NJLAD class

should be limited to New Jersey employees and b) the claims should be dismissed as per the

individually named defendants.  The Court ruled in Quest's favor.  (*See generally* 3/28/2012 Op.

[D.E. 66].)  After the ruling, Seibert indicated that she was abandoning her NJLAD class claim.

[*See* D.E. 68.]

After taking discovery, the parties filed motions for summary judgment.  In its written

opinion on the motions, the Court held that Seibert had adduced sufficient evidence on the

§ 1140 claim to survive summary judgment because "[t]his record, like the one in *Eichorn* [*v.*

*AT&T Corp.* [*Eichorn I*], 248 F.3d 131 (3d Cir. 2001)], offers circumstantial evidence supporting

Seibert's § [1140] claim."  (S.J. Op. 11 [D.E. 119].)  In particular, her evidence showed that

management was "concerned about Quest's financial condition, from which a factfinder could

reasonably infer that, at the time she was terminated for cause, the company was motivated to

reduce or eliminate severance costs."  (S.J. Op. 11–12.)  That evidence included "an email

among employees in the Human Resources and finance departments concerning a sales

reorganization plan (apparently unrelated to Seibert's territory) that had gone awry" and

referencing "unexpected severance payments that could result"—a development that might, the

email's author warned, attract the unwanted attention of "Corporate." (S.J. Op. 12.) Such evidence also could be reasonably construed to show pretext. (*See* S.J. Op. 14–15.)

At the end of this part of the discussion, the Court addressed in a footnote an argument that Quest raised for the first time in its reply brief: Seibert would not be able to get money damages if she prevailed, so there was an independent basis for granting summary judgment. The Court summarized the case Quest relied on and found the argument overall to be neither "persuasive [n]or timely raised." (S.J. Op. 15 n.5.)

After determining that the individual NJLAD claim survived summary judgment, the Court moved on to Seibert's ERISA claim under § 1132(a)(1)(B). Section 1132(a)(1)(B) allows a plan participant to bring a claim to recover benefits due to her under the plan, but generally requires that a claimant first exhaust available remedies. The parties had filed cross motions on this particular ERISA claim. Seibert argued that she should have been excused from fully exhausting plan remedies because the benefits-denial notice she received did not include a description of appellate rights, as required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(g)(1), and also failed to state with specificity the grounds for denying her claim. Noting that the proper remedy for these violations was not a pass on exhaustion but an out-of-time appeal or remand to the plan administrator, the Court rejected this argument. (S.J. Op. 23 & n.7.) The Court further held that Seibert lacked standing to request a declaratory judgment regarding the appeals process. (S.J. Op. 24.) In conclusion:

> As a practical matter, if Seibert prevails on her NJLAD and ERISA § [1140] claims, she arguably will not need an administrative forum to seek relief. If she is unsuccessful, she will have the option to bring an out-of-time appeal administratively. On her claims under § [1132], then, Quest's motion is granted and Seibert's is denied, without prejudice to her invoking the administrative appeals process and seeking further judicial review if warranted.

(S.J. Op. 24.)

B) Class-Certification Motion

Seibert now moves to certify a 29 U.S.C. § 1140 class pursuant to Fed. R. Civ. P. 23(b)(3), proposing the following class definition:

> all persons who held sales positions in the Quest Diagnostics Incorporated physician or hospital sales organization; were placed on performance improvement plans ("PIPs") from November 18, 2008 through August 20, 2011 (the "Class Period"); either "voluntarily" resigned from such position or were terminated from such position on the basis of performance during the Class Period; and did not receive full severance benefits under the Quest Diagnostics Incorporated Severance Pay Plan ("the Severance Plan") . . . .[1]

(Pl.'s Proposed Order 1 [D.E. 124-12].)  On behalf of the class, Seibert seeks declaratory relief, "[c]lass-wide equitable restitution for economic losses suffered by Class Members from the resulting loss of severance benefits, the prevention of unjust enrichment by Quest which has retained benefits owed to Class Members, and disgorgement of benefits that would have been paid to Class Members had Quest not violated ERISA."  (Pl.'s Moving Br. 2–3 [D.E. 124-1].)

Documents presented in support of the motion include deposition excerpts, many email chains, and Quest policy documents; Seibert also submits materials pertaining to law-firm qualifications and the numerosity of the class.  (*See generally* Nash Decl. [D.E. 124-2]; Nash Supp. Decl. [D.E. 132-1].)  Defense exhibits include, in addition to the above, performance evaluations and exhibits designed to narrow the scope of any class that might be certified.  (*See, e.g.*, Arrigoni Cert. [D.E. 127-3].)

---

[1] Quest objects to this proposed class definition because it omits the "40 years of age or older" condition present in previous iterations, like the one in the amended complaint.  According to Quest, the earlier, narrower proposed definition governed "the scope of extensive discovery by both parties and [] was in place at the time of the entry of the Final Pretrial Order," and thus should be binding on Seibert.  (Opp'n Br. 49 [D.E. 127].)  Seibert disagrees, saying that some discovery has already been exchanged on employees under 40.  (Pl.'s Reply Br. 19 n.22 [D.E. 132].)  Because class certification will ultimately be denied, the Court need not reach the scope of the proposed class.

1) *Seibert Argues that the Court Should Certify a 23(b)(3) Class*

   a) <u>Performance Standards and Centralization</u>

As Seibert describes her lawsuit, the "heart of [the] case is the common claim that Quest systematically deprived salespeople of severance benefits as a cost-cutting measure starting in 2008 and continuing through 2011." (Pl.'s Moving Br. 1.) She identifies Quest's former Vice President of Sales and Marketing for Quest's Physician Sales organization, John Nosenzo, as the person who designed the offending program and put it into effect.

Nosenzo, a former Siemens manager, was hired by Quest in January 2008. (*See* Pl.'s Ex. 12, Nosenzo Dep. 7:3–18 [D.E. 124-5].) At the time, Quest's physician sales business was "struggling," in part due to "lost . . . contracts with health plans." (Nosenzo Dep. 10:12–22.) In particular, in 2007 Quest lost business due to the non-renewal of its contract with United Healthcare. Among Nosenzo's goals were addressing "issues of poor performance throughout physician sales" and "mak[ing] significant changes at every level" from "sales representative through sales VP." (Pl.'s Ex. 44, Nosenzo 2008 MBO 2 [D.E. 124-7].) Quest had also launched "Project Reshape" that year, a program whose three-year goal was "achieving $500 million or more in net cost reductions." (Pl.'s Ex. 7, Hagemann Dep. 7:6–24 [D.E. 124-5].) Some of those reductions were to come from "reducing people cost[s]." (Pl.'s Ex. 10, Mohapatra Dep. 58:21–59:21 [D.E. 124-5].) Nosenzo was put in charge of (among other things) reducing headcount by ten percent to brings costs under control. (*See* Nosenzo Decl. ¶ 5B [D.E. 127-9].) He did not want to effect this reduction through a RIF, and instead "drove the consolidation of some open positions" while "not filling . . . positions as they became open." (Pl.'s Ex. 31, Sept. 15, 2008 Email from Nosenzo to Mohapatra [D.E. 124-7].)

Seibert's brief argues that Nosenzo decided that this form of slow attrition was insufficient, and began to implement a top-down restructuring of how employees were evaluated and terminated.  Some of the reforms had been previously used at Siemens.  (*See* Pl.'s Ex. 21, Apr. 29, 2008 Email from Jack Kenny [D.E. 124-6].)  She points to several communications that, she asserts, show Nosenzo and other central staff taking performance-management authority away from the Human Resources (HR) department.  For example, Dr. Joyce Herlihy, the Director of HR at Quest through the beginning of Nosenzo's tenure in 2008, said at her deposition that certain HR functions pertaining to terminations would ordinarily be covered by the "local" or regional HR employees "in the field."  (Pl.'s Ex. 8, Herlihy Dep. 14:12–22 [D.E. 124-5].)  In May 2008, Herlihy wrote in an email that she had "reached out to all of the senior HR leaders . . . in reference to our renewed emphasis on the performance management process of the salesforce," relating the overall "positive" reaction because "this will indicate that it is not an 'HR thing' but rather something that is driven from sales leadership."  (Pl.'s Ex. 26, May 21, 2008 Letter from Herlihy [D.E. 124-6].)  In July 2008, Nosenzo reemphasized that performance-management goals "should not be HR driven" but should be "[s]ales [l]eadership driven (with help from HR)."  (Pl.'s Ex. 28, July 18, 2008 Email from Nosenzo to Mohapatra [D.E. 124-6].)  Within a series of August emails to a regional sales leader, Nosenzo repeated that he did not want to "lose control of the process" and have it become "a watered down [HR] process."  (Pl.'s Ex. 48, Aug. 8, 2008 Email Chain Between Nosenzo and Hamlin [D.E. 124-7].)  And in a December 2008 email, Nosenzo sought from regional managers "list[s of] all of your employees and the rating you think they deserve," underscoring that "[n]o write ups or communication is to occur with employees prior to final sign off from me."  (Pl.'s Ex. 36, Dec. 15, 2008 Nosenzo Email [D.E. 124-7].)

Seibert stresses that the elements of the new process that appeared to give local and regional managers some authority, such as the "Session Q" meetings, were in reality "marathons" designed to flunk as many employees as possible—and Nosenzo maintained a final say over all employee "scorecards."  (*See* Pl.'s Ex. 83, Scorecard Process Powerpoint 15 [D.E. 124-10].)  A memo from Nosenzo describing the "Session Q" evaluation meetings, which he attended, emphasized that the "core competencies" were "defined by senior management."  (*See* Pl.'s Ex. 45, July 2, 2009 Email from Nosenzo & Attachment [D.E. 124-7].)

Moreover, Seibert contends that while Nosenzo was centralizing performance-management authority, he was recalibrating evaluations to prioritize sales quotas above all other elements, disrupting the way employee performance had generally been assessed.  A summary of remarks at an October 2008 Board of Directors meeting, for example, reflected that Quest was "driving an increased focus on total [sales force] attainment as a singular performance measure." (Pl.'s Ex. 34, Oct. 31, 2008 Physician Sales and Marketing Update [D.E. 124-7].)  According to Seibert, a new emphasis on "consistency across [the] organization . . . across geographies," and on "common . . . approach[es] to talent management" (Pl.'s Ex. 37, Jan. 2009 Pre-Meeting Training Powerpoint 7 [D.E. 124-7]) referred to the elevation of objective sales quotas, centrally formulated, without taking into account the characteristics of each sales region—a departure from the prior regime, in which performance standards had not changed for several years prior to Nosenzo's arrival (*see* Herlihy Dep. 31:15–32:20).  Those failing to meet the new performance quotas—and Seibert argues that some of the benchmarks were very difficult to satisfy, based on the realities of both the market and the particular geography of a given sales area—were placed on Performance Improvement Plans (PIPs).  Employees put onto PIPs rarely escaped termination, because the PIPs were designed to be a "figurative death sentence."  (Pl.'s Moving

Br. 12–14.)  Several of the employees on PIPs after the aforementioned policy revisions were long-term employees of Quest and former award winners (*see* Pl.'s Ex. 9, Kane Dep. 32:10–33:8 [D.E. 124-5]), and Seibert points to panicked/upset letters from employees who found themselves suddenly dropping to unacceptable levels of performance when evaluated based on new quotas (*see, e.g.*, Pl.'s Exs. 42, 46–47 [D.E. 124-7]).  On the other side, those charged with implementing the new policies were uncertain about how flexible the new standards were supposed to be.  (*See, e.g.*, Pl.'s Ex. 30, Sept. 2009 Email Chain [D.E. 124-6].)

Based on the above and other exhibits, Seibert characterizes the changed performance standards under Nosenzo as an RIF in disguise, a way to eliminate employees without paying severance.  She cites to email chains in which managers discussed changing evaluation results (*see* Pl.'s Ex. 61, Feb. 2010 Email Chain [D.E. 124-8]) to argue that the new performance scheme was "show and pretense."  (Pl.'s Moving Br. 15.)  While it had the effect of reducing headcount, with an HR manager noting a "dramatic shift in [Quest's] 2009 [performance] distribution" (Pl.'s Ex. 74, July 27, 2010 Email from Thomas DeLuca [D.E. 124-9]), some managers worried that the company was "reaching a crisis level."  (Pl.'s Ex. 64, Mar. 26, 2010 Email from Mohapatra to Norgard [D.E. 124-8].)  Seibert also points to several documents dating from after Nosenzo's departure in May 2010, such as a decision to remove certain objective categories from employee performance scorecards (*see* Pl.'s Ex. 70, Aug. 12, 2010 Email Chain [D.E. 124-8]), to suggest that the situation gradually normalized after he left Quest.

### b) Seibert Contends that This Suit Meets the Fed. R. Civ. P. 23 Standard

According to Seibert, the Fed. R. Civ. P. 23(a) and 23(b)(3) factors are satisfied.  First, because of the top-down nature Nosenzo's management and performance changes, the elements of the § 1140 claim are "susceptible to common proof," because evidence presented to support a

circumstantial case under § 1140 (which survived at the summary judgment stage) would be the same across a class.  (Pl.'s Moving Br. 19, 21–23.)  That § 1140 claims often involve common elements, Seibert submits, is shown by Third Circuit cases like *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir. 1987), which involved § 1140 ERISA claims that had been certified as class actions.  (Pl.'s Moving Br. 24–25.)

Moving to the enumerated Rule 23(a) factors, Seibert asserts that the 112 proposed class members easily satisfy the numerosity threshold; that commonality is satisfied based on the common questions of law and fact discussed above; that her claims are "typical" of those of the proposed class members; and that she and her attorneys will sufficiently protect class interests, and are thus adequate representatives.  (*See* Pl.'s Moving Br. 29–34.)  In discussing Rule 23(a)(2), commonality, Seibert distinguishes the facts of *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), by stressing the far smaller size of her proposed class (versus that of *Dukes*) and the centralization of Quest's performance and review authority under Nosenzo.  (*See* Pl.'s Moving Br. 31 n.17.)  Finally, Seibert maintains that the proposed class meets the Rule 23(b)(3) standards, because the common questions identified earlier predominate and are best resolved via a class action.  (*See* Pl.'s Moving Br. 34–38.)

## 2) *Quest Argues that Certification is Inappropriate; Decisions Decentralized*

Quest does not contest the adequacy of class counsel.  But it relies on a starkly different reading of the relevant facts.  Rather than consolidating decision-making authority in Nosenzo, Quest argues, the new performance standards vested decision-making power in individual managers.  In support, Quest has produced affidavits from managers attesting to the poor work performance of several putative class members.

10

According to Quest, the loss the United Heathcare contract in 2007 led the company to examine what it described as years of sales-representative complacency.  Upon arriving at Quest, Nosenzo encountered a culture where "many sales people tended to take the position that none of the decline in revenue was their responsibility and that there was nothing they could do to replace that lost revenue."  (Nosenzo Decl. ¶ 9A.)  Sales representatives could "fail to achieve their sales quotas year after year, but still be rated as having" achieved expectations.  (Nosenzo Decl. ¶ 6C.)  He saw his reforms as raising "the performance bar for all sales employees, including" himself and other management.  (Nosenzo Decl. ¶ 9A.)  The changes about which Seibert complains—the Session Q meetings, the performance-based scorecards—were used as tools to "bring consistency, transparency, and accountability to the performance assessment process."  (Opp'n Br. 11 (citing Nosenzo Decl. ¶ 18).)

Quest emphasizes that these changes, while top-down, were not centrally governed.  In his declaration, Nosenzo claims that he attended some of the Session Q meetings, but not all, and was often joined by others from various management tiers and departments.  (*See* Nosenzo Decl. ¶¶ 7, 17.)   Individual managers, meanwhile, were responsible for scorecard rankings, and were not directed by senior management on what ratings to provide.  (*See* Pl.'s Ex. 17, Dec. 15, 2008 Email from Nosenzo [D.E. 124-6]; Nosenzo Decl. ¶ 21)

Citing affidavits provided by five Quest employees—sales directors Albrecht, Meyer, and Orzolek; district sales manager Behrend; and Western Region Vice President Hamlin—Quest claims that each manager independently dealt with underperforming employees, in contrast to Seibert's position that PIP placement meant guaranteed termination.  For example, Meyer attests that she was not directed by "any . . . member[] of Quest['s] . . . senior management . . . including John Nosenzo, on how to evaluate" an employee.  (Meyer Decl. ¶ 14 [D.E. 127-8].)

Meyer lists several employees whom she supervised who were placed on PIPs but were not terminated.  (Meyer Decl. ¶ 28.)  Albrecht affirms that he never communicated with Nosenzo or other central management with regard to a certain terminated employee, and did not terminate that employee in order to avoid having to pay her severance benefits.  (Albrecht Decl. ¶¶ 13–14 [D.E. 127-1].)

Quest also argues that the ERISA claims and Seibert's individual NJLAD claim are incompatible based on both legal theory and breadth of relief available.  (*See* Opp'n Br. 37–38.) In the course of this argument, Quest reemphasizes its position that success under § 1140 would not lead to "any monetary damages."  (Opp'n Br. 37 n.9.)

Addressing commonality, Quest accuses Seibert of minimizing the importance of *Dukes*, which required common contentions to be of "such a nature that [they are] capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.  Quest contends that Seibert's list of "common questions" is incapable of generating the common *answers* that *Dukes* requires.

Finally, Quest argues 1) that counting only "appropriate or eligible" class members, the proposed class falls short of the numerosity threshold; 2) that common issues do not predominate within the proposed class; and 3) that based on the individual determinations made in Quest's job-performance evaluations, a class action would not be the superior method for adjudicating disputes arising therefrom.  (*See* Opp'n Br. 20–26, 40–50.)

## II. Jurisdiction and Standards

This Court exercises federal-question jurisdiction over the ERISA claim through 28 U.S.C. § 1331.  Supplemental jurisdiction extends over the state-law claims (which are not the subject of this motion) through 28 U.S.C. § 1367.

In deciding whether a class should be certified, a court must be satisfied that the prerequisites of Rule 23—here, the factors of Rule 23(a) and Rule 23(b)(3), along with ascertainability—have been met.  *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).  The Rule 23 requirements are "not mere pleading rules"; the "party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence," and "actual, not presumed conformance with Rule 23 requirements is essential."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (internal alterations, quotation marks, & citations omitted).

Although the class-certification stage is not the time to conduct a "free-ranging merits inquir[y]," the underlying merits of the suit are relevant "to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).  In evaluating the merits, a court may "probe behind the pleadings" to investigate considerations relevant to class-certification that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks & citations omitted).

## III. Discussion

Recognizing the effect of *Dukes* on class-certification decisions, the parties focus their attention on debating whether the purported RIF-in-disguise scheme was 1) a centralized,

pretextual process characterized by a lack of local discretion and decision-making, the viewpoint urged by Seibert; or 2) a lawful, reasonable reaction to changes in the market that relied on a diffuse structure and was by no means a "death sentence" to affected employees, the viewpoint advanced by Quest.  In particular, Seibert urges the Court to see the § 1140 claim as a single question leading to a single answer: if the revised approach to evaluations was a pretext to reduce the workforce without paying severance, then the same liability attaches with regard to *all* putative class members terminated under it.

While the § 1140 claim survived summary judgment, whether it is appropriate for class treatment is another matter.  Section 1140 claims have been certified in this Circuit—two of the cornerstone Circuit cases on § 1140 jurisprudence, *McLendon v. Continental Can Co.*, 908 F.2d 1171 (3d Cir. 1990), and *Gavalik*, are class-action cases (although neither was a certification appeal), as are cases like *Fischer v. Philadelphia Electric Co.*, 994 F.2d 130 (3d Cir. 1993).

The Court concludes that certifying this suit as a class action would not be proper under Fed. R. Civ. P. 23 based on the specific facts of the case, the particular ambit of § 1140 (especially with regard to the remedies available), and the possible divergence between Seibert's claims and those of the putative class.

A) <u>ERISA § 1140 – Statutory Structure</u>

    1) *Statutory Language and Prohibited Acts*

Under the pertinent part of 29 U.S.C. § 1140, an employer may not:

discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

Section 1140 covers non-vested welfare benefit plans like the Quest severance plan.  *See Inter-Modal Rail Emps. Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 514–16 (1997).  The employer is generally, but not always, the proper defendant in a § 1140 suit.  *See* Paul Schneider & Brian Pinheiro, *ERISA: A Comprehensive Guide* § 8.05(b)(1) (4th ed. 2012).  Success on a § 1140 claim requires a showing that an employer made a "conscious decision to interfere with the employee's attainment of . . . benefits," although 1) that need not be the "only reason" for a termination, 2) showing an actual injury is not required, and 3) circumstantial evidence can suffice.  *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 785 & n.1 (3d Cir. 2007) (internal quotation marks and citations omitted).  A burden-shifting test is used to resolve a § 1140 claim.  *See id.* at 785–86.

Section 1140 does not provide an independent mechanism for relief; rather, it states that "[t]he provisions of section 1132 of this title shall be applicable in the enforcement of this section."  29 U.S.C. § 1140; *see also Jakimas*, 485 F.3d at 780 n.16 ("Section [1132(a)] . . . is the vehicle by which a plaintiff may bring suit for a violation of § [1140].").  The statutory language does not specify which part of § 1132 is to be used: subsection (a)(1), allowing a participant or beneficiary to obtain certain information, recover due benefits, enforce her rights, or clarify rights to future benefits; or subsection (a)(3), allowing a participant, beneficiary, or fiduciary to enjoin an ERISA-prohibit act or practice, or to otherwise "redress such violations" or "to enforce any provisions of this subchapter or the terms of the plan" by obtaining "appropriate equitable relief."

In *Eichorn v. AT&T Corp* [*Eichorn II*], 484 F.3d 644 (3d Cir. 2007), the Third Circuit held that a § 1140 claim is "not enforceable" under § 1132(a)(1)(B), which is the subsection "provid[ing] a cause of action only where a plaintiff alleges a violation of the terms of a benefits

plan or an ambiguity in the plan requiring judicial interpretation" and which does not address "claim[s] of interference with the benefits of a plan." *Id.* at 652, 654; *see also id.* at 652–53 (collecting cases).  Therefore, § 1140 violations may be vindicated only through the equitable remedies available in § 1132(a)(3).[2]

As the Supreme Court has made clear, "appropriate equitable relief" under § 1132(a)(3) does not extend to a pure suit for money damages; rather, it refers to those categories of relief that were typically available in equity.  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  Such relief includes injunction, mandamus, and restitution, and while these remedies may involve the payment of money, they do not cover a "request for compensatory damages merely framed as an 'equitable' injunction."  *Eichorn II*, 484 F.3d at 654–55.  Instead, "[a] remedy involving payments is permissible so long as those payments would have historically been available in courts of equity."  *Pell v. E. I. DuPont De Nemours & Co.*, 539 F.3d 292, 307 (3d Cir. 2008).

Courts determine the exact contours of the legal/equitable divide in the contexts of specific fact patterns, leading to different results.  For example, courts have decided that back

---

[2] Seibert claims that this Court has already "rejected" Quest's "assertion that [she] is limited to injunctive" relief for her § 1140 claim, and is bound by that ruling.  (*See* Pl.'s Reply Br. 10.) This is not the case.  Quest raised the scope of relief in its summary-judgment reply brief; relying on *Eichorn I*, the Court disagreed that a monetary award was per se unavailable and decided that 1) Quest's argument was not timely raised and 2) the argument as specifically put forth did not entitle Quest to *summary judgment relief* on the claim.  Because of the different standards of review in play, the outcome here is different.  *See Farina v. Nokia, Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010); s*ee also Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n.7 (3d Cir. 2003) ("Similarly, courts may refuse to infer decisions on issues that were barely presented, or from summary decisions.").  Besides, Seibert's filings reflect her awareness that the relief available under § 1140 is limited to equitable remedies.  (*See, e.g.*, Am. Compl. ¶ 211 ("Plaintiff seeks equitable relief in the form of restitution to compensate her and the ERISA Sub-Class for economic losses suffered from the loss of employment . . . ."); Pl.'s Moving Br. 2–3 (discussing "prevention of unjust enrichment" and "disgorgement").)

pay, in the form of restitution, is an appropriate equitable remedy.  *See, e.g.*, *Schwartz v. Gregori*, 45 F.3d 1017, 1022–23 (6th Cir. 1995); *Shaver v. Siemens Corp.*, No. 2:02CV1424, 2008 WL 859251, at *2 (W.D. Pa. Mar. 28, 2008).  Others have held to the contrary.  *See, e.g.*, *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1260 (10th Cir. 2004).  The case law is clear that "whether a particular form of relief is legal or equitable in nature is largely dependent on the facts of a particular case."  *Sessions v. Owens-Illinois, Inc.*, No. 1:07-CV-1669, 2008 WL 4821755, at *6 n.10 (M.D. Pa. Nov. 4, 2008).

### 2) *Relationship to § 1132(a)(1)*

Seibert's amended complaint contained a § 1132(a)(1) claim, in which Seibert asked this Court to review Quest's decision to deny her (and the class members) benefits.  (*See* Am. Compl. ¶¶ 212–16.)  Summary judgment was granted on this claim because Seibert had not exhausted her administrative remedies under the Severance Plan.

One of the distinctions between § 1132(a)(1) and a claim through § 1140 in this Circuit is that the latter generally requires no exhaustion of remedies, while the former does.  *See Zipf v. AT&T Co.*, 799 F.2d 889, 893 (3d Cir. 1986); *accord D'Amico v. CBS Corp.*, 297 F.3d 287, 291 (3d Cir. 2002).  Exhaustion is still required, however, when a statutory claim "merely recasts [a] benefits claim in statutory terms."  *D'Amico*, 297 F.3d at 291 n.3 (alteration in original).

## B) Seibert's Claims Diverge From, and Are Not Typical Of, the Putative Class Members'

Seibert wishes to bring a § 1140 claim on behalf of class members terminated without "full severance benefits" after placement on a PIP.  She seeks injunctive relief, although she does not specify what, exactly, she means to obtain for the class.

The typicality prong of Fed. R. Civ. P. 23(a) looks at whether the named plaintiff's claims are typical of those of the class, thus indicating alignment, whereas the adequacy prong seeks to uncover possible conflicts of interest between the named plaintiff and the class. *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). An analysis of the proposed class, combined with the statutory discussion above, demonstrates that Seibert has not met her burden of satisfying these Fed. R. Civ. P. 23(a) factors by a preponderance.

The record shows that Seibert briefly attempted to vindicate her rights under the Plan, but failed to completely pursue administrative remedies, leading to summary judgment on her § 1132(a)(1) claim. But it is unclear whether other putative class members attempted to exhaust their administrative remedies under the Plan. Furthermore, as the Court explained in its summary judgment opinion, Seibert's arguments attempting to excuse exhaustion actually supported permission for her to appeal out-of-time. Seibert may yet be able to vindicate her rights through an untimely administrative appeal, an option that might not be available to putative class members. By proceeding solely on a § 1140 claim, class members might forfeit rights available under the alternative § 1132(a)(1) route, especially given the unclear relationship between the award to which Seibert and class members would be entitled under a § 1140 action versus one brought under § 1132(a)(1).

Second, the presence of NJLAD claim, while not in inherent conflict with the § 1140 claim, does afford Seibert a different breadth of relief than would be available to the class members. Compensatory and punitive damages are both available under NJLAD, but neither can be sought in a § 1140 claim. *See, e.g.*, *Rusak v. Ryan Automotive, L.L.C.*, 418 N.J. Super. 107, 117–18 (App. Div. 2011). So she has a "backup" under the NJLAD that would not be available to the other class members; even if she and the class *were not entitled to money damages under*

*§ 1140 at all* (which this Court was not called upon to earlier decide), Seibert would be able to

rely on her NJLAD claim to make up for the shortfall.

Third, the present lack of clarity in the law suggests that minor variations in exhaustion

status or even benefit payout—the class definition includes those employees who received some,

but not all, benefits under the severance plan—could lead to the unique defenses being levied

against Seibert that might not be applicable to other class members.  As the Third Circuit has

said:

> [U]nique defenses bear on both the typicality and adequacy of a class
> representative.  .  .  .  [C]ourts of appeals emphasize, as do we, the challenge
> presented by a defense unique to a class representative—the representative's
> interests might not be aligned with those of the class, and the representative might
> devote time and effort to the defense at the expense of issues that are common and
> controlling for the class.  .  .  .  A class representative should not be permitted to
> impose such a disadvantage on the class.

*Maximus*, 457 F.3d at 296–97 (internal quotation marks & citations omitted).

Fourth and finally, Seibert earlier stressed the special challenges arising out of her sales

territory, challenges that greatly exacerbated her inability to meet the new performance quotas.

Backed up by the testimony of her sales manager, and as the parties stipulated in the Joint

Pretrial Order (*see* JPTO 17), Seibert referenced:

> the "questionable" business practices of competitors in her territory, "the politics
> of the local hospital," a "tough territory climate" with "unique market dynamics,"
> and that her territory was facing "tumultuous market conditions" and had "little
> opportunity to grow."  In the years leading up to her termination, several clients in
> Seibert's territory discontinued doing business with Quest. According to [the sales
> manager's] deposition testimony, the majority of these losses were probably not
> within Seibert's control. (Giordano Dep. 139:8–140:1.)

(S.J. Op. 4.)  Such special circumstances exist in tension with Seibert's central premise for her

§ 1140 class, which is that the one-size-fits-all, top-down policy enacted by Nosenzo and other

upper-level managers at Quest was intended to eliminate employees on a company-wide basis.

Quest has submitted evidence suggesting that some members of its force did survive the PIP

process; Seibert would point to these as exceptions to the general rule to the contrary.  But the territory to territory differences alleged, and the unique factors affecting her territory, add additional ambiguity to the uniformity of *her* claim versus that of the proposed class.  Further, each class member is likely to have operated in his/her own unique market conditions, differing from the baseline Seibert proposes just as much as Seibert herself differs.

In sum, the Court finds that Seibert has not shown, by a preponderance, that the Rule 23(a) factors of adequacy and typicality are satisfied.

## C) Commonality, Predominance, and Superiority

Under *Dukes*, the commonality requirement of Rule 23(a)(2) has arguably been broadened.  Commonality required a showing of a class-wide injury, but it also now demands a showing of class-wide resolution.  *See Dukes*, 131 S. Ct. at 2551.  Meanwhile, Rule 23(b)(3) is satisfied when the movant shows "that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010).  The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Marcus*, 687 F.3d at 600 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

Assuming, without deciding, that Seibert has satisfied the commonality requirement of Rule 23(a), the Court concludes that she has not shown that the common issues predominate within the class.  This affects both the front end and back end of her claim.

On the front end, predominance encounters the same problems discussed above in adequacy and typicality.  The inferences required by the *Gavalnik* burden-shifting approach suggest that the common-quest/common-answer model proposed by Seibert—"was this policy

intended to force people out without paying severance? If yes, I win, as does the class"—is an oversimplification. Despite Quest's alleged centralization, class members were active in different market conditions, faced different geographical challenges, and worked under different managers. Others may have exhausted their remedies, suggesting that relief under § 1132(a)(1) would take precedence over injunctive relief under § 1132(a)(3).

On the back end, the Court confronts the problem of the remedy sought by the class. As discussed above, case law suggests that the appropriateness of equitable remedies depends largely on both an individual plaintiff's situation and the exact posture of her request for relief. *See, e.g.*, *Gregori*, 45 F.3d at 1022–23 ("[W]e conclude that the back pay awarded *here* constituted restitution, and therefore is an equitable remedy . . . ." (emphasis added)). The exact nature of the Plan, and the individual employees' positions when terminated, would complicate attempts to calculate individual remedies among the class members. *See In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 140–41 (2d Cir. 2001) (recognizing that difficult individualized damages calculations can, in tandem with other factors, support a decision to deny class certification), *overruled on other grounds as stated in Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 203 (2d Cir. 2008)

> Further, under the superiority factor of Rule 23(b)(3):
>
> Superiority mandates that the district court determine that the class action is the best method of fairly and efficiently resolving the controversy. To assist the court in analyzing cases for predominance and superiority, Rule 23(b)(3) includes a nonexclusive list of relevant factors to consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 185 (3d Cir. 2001) (internal citations omitted). Based on the discussion above, the Court finds that factors (A) and (D) weigh against a class

action being the superior method of resolving this particular ERISA claim.  Individual plaintiffs would be better able to tailor their claims to their lengths of service and territorial/market-based realities.  They would also be able to seek relief under individual state statutes and other ERISA provisions that offer a broader range of damages.  And the ambiguities in the relief offered by § 1140 suggest that individual suits would avoid management problems that might arise from a one-size-fits-all approach.

Because the Court has found that the adequacy and typicality inquiries of Fed. R. Civ. P. 23(a) are not satisfied, along with the superiority and predominance factors of Fed. R. Civ. P. 23(b), the Court need not reach the other Rule 23 factors.  Since "[f]ailure to meet *any* of Rule 23(a) or 23(b)'s requirements precludes certification," *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008) (emphasis added), certification must be denied.

## IV. <u>Conclusion</u>

The motion for class certification is denied.  An appropriate order will be entered.


March 31, 2014                                              /s/ Katharine S. Hayden
                                                           Katharine S. Hayden, U.S.D.J.